IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BANCROFT LIFE & CASUALTY ICC, )
LTD., )
                                )
                                )
          Plaintiff,            )
                                )
          v.                    ) Civil Action No. 10-704
                                )
INTERCONTINENTAL MANAGEMENT,    )
LTD d/b/a INTERCONTINENTAL      )
CAPTIVE MANAGEMENT COMPANY,     )
LTD., INTERCONTINENTAL          )
MANAGEMENT, LTD., THE ROBERTS   )
AND PATTON LAW FIRM, JOHN R.    )
PATTON, ESQUIRE, GEORGE THOMAS  )
ROBERTS, ESQUIRE, NIGEL BAILEY, )
CUNNINGHAM HUGHAN & COMPANY,    )
INC. and THOMAS HUGHAN, C.P.A., )
                                )
          Defendants.           )

**REDACTED OPINION**

In this diversity action, Plaintiff, Bancroft Life &

Casualty ICC, Ltd. ("Bancroft"), seeks damages for breach of

fiduciary duty, fraud, conversion, malpractice, defamation,

breach of contract, tortious interference with existing

contractual relationships and tortious interference with

prospective economic advantage. Bancroft has moved for

preliminary injunctive relief against Defendants Intercontinental

Captive Management Company, Ltd. ("ICMC"), Intercontinental

Management, Ltd. ("IML"), The Roberts and Patton Law Firm, John

R. Patton, Esquire ("Patton"), George Thomas Roberts, Esquire

("Roberts") and Nigel Bailey ("Bailey") (collectively, "the

1

Injunction Defendants").[1]  Specifically, Bancroft seeks an Order
(a) compelling the Injunction Defendants to turn over all of
Bancroft's records that are in their possession and (b)
restraining the Injunction Defendants from interfering with
Bancroft's contractual and business relationships with certain
companies.  After hearing and for the reasons set forth below,
the motion for preliminary injunctive relief will be granted.

## FINDINGS OF FACT

Based on the present record, the Court concludes that it is
reasonably probable the following facts will be established in
this case:

1.  Bancroft is an insurance company owned by the Bancroft
Trust.  Philip Sigel ("Sigel") and Bradley Barros ("Barros") each
own 50% of the Bancroft Trust.  Sigel is the Trustee.  (Docket
No. 79, p. 17, Docket No. 81, p. 90).

2.  Bancroft offers customized, tax-advantaged lines of
insurance to United States companies that generally are not
available in the United States.  Specifically, a company that
creates a self-insurance fund typically is required to pay taxes
to the United States government on the fund.  In contrast, if the
statutory and regulatory requirements of the jurisdiction in
which Bancroft is domiciled are strictly followed, a United

---

[1]Bancroft has not moved for preliminary injunctive relief
against Defendants Cunningham Hughan & Company and Thomas Hughan,
C.P.A.

2

States company participating in Bancroft's insurance program can deduct the premium payments on its tax return.[2] (Docket No. 1, ¶ 1, Docket No. 41, ¶ 1, Docket No. 79, pp. 19-20).

3. Bancroft pools the premium payments of its insured companies and invests them in securities. At the expiration of an insurance policy's term, which is usually 5 years, Bancroft refunds the premium payments that were made by the insured company (plus any earnings or minus any losses on the investment of the premium payments) less any claims paid by Bancroft on behalf of the insured company and Bancroft's general administrative expenses. (Docket No. 79, pp. 19-20).

4. At the time of Bancroft's formation in the British Virgin Islands in 2003, Sigel and Barros were its directors. The Roberts and Patton Law Firm, which was located in Ligonier, Pennsylvania, was retained to serve as Bancroft's general counsel based on the alleged expertise of Roberts and Patton in international insurance and tax law. (Docket No. 79, p. 24, Docket No. 82, p. 29).

5. In addition to being a partner of The Roberts and Patton Law Firm, Roberts was the president of ICMC, a corporation organized in 2000 in the United States Virgin Islands. ICMC

---

[2]Bancroft earns money by charging its insureds various fees, including a fee on premium payments and an asset management fee. In addition, Bancroft's insureds may borrow up to 75% of the premium payments made to Bancroft, and Bancroft charges origination and service fees on these secured loans. (Docket No. 79, p. 20).

3

offered management and administrative services to international insurance companies. The principal place of business of ICMC was located in Greensburg, Pennsylvania. Patton, Bailey and Stewart A. Schwab ("Schwab") served as ICMC's Vice Presidents. (Docket No. 1, ¶ 3, Docket No. 41, ¶ 3, Pl's Exh. 60, Docket No. 79, p. 24, Docket No. 82, pp. 10-11, 37).

6. ICMC was strictly a management company for international insurance companies. It was not licensed to sell insurance. Thus, Bancroft and ICMC were not competitors. (Docket No. 82, pp. 37-38).

7. Based on the recommendation of Roberts, Bancroft and ICMC entered into an "Insurance and Taxation Services and Advisory Agreement" ("the Management Agreement") on October 15, 2004. In the Management Agreement, which was drafted by Roberts, ICMC agreed, among other things, to (a) maintain complete records of Bancroft's insurance transactions, (b) prepare all policies of insurance issued by Bancroft, (c) prepare and mail premium notices and arrange for the collection of premiums, (d) evaluate, accept, reject, adjust or settle claims on Bancroft's behalf, (e) maintain complete books, records and accounts of Bancroft, (f) maintain and operate Bancroft in compliance with the laws of its domicile jurisdiction, including the preparation and filing of all required reports, and (g) prepare Bancroft's financial

4

statements and tax returns.[3]  (Pl's Exh. 1, Docket No. 79, pp. 22-24).

8.  The Management Agreement specifically provided that Bancroft retained ownership of all books and records produced by ICMC in connection with its management of Bancroft's day-to-day operations.  Regarding termination, the Management Agreement provided:

\*  \*  \*

6.  This Agreement may be terminated by either party by giving to the other party 90 days' notice in writing. Termination of this Agreement shall not relieve either party of its liability for the performance of obligations imposed upon the said party during the effective period of this Agreement if such obligations have not been performed or completed at the time of termination.

\*  \*  \*

(Pl's Exh. 1, p. 5).

9.  In 2006, Bancroft relocated to the island of St. Lucia.[4] Nicholas John, Esquire ("John"), a resident of St. Lucia, was retained to serve as Bancroft's local counsel.  Upon Bancroft's relocation, Sigel, Barros and John applied to the government of St. Lucia to become directors of Bancroft, submitted the required paperwork, underwent criminal background checks and ultimately

---

[3]ICMC subcontracted the preparation of Bancroft's tax returns to Defendants Thomas Hughan, C.P.A. and Cunningham Hughan & Company, Inc.  (Docket No. 82, p. 40).

[4]According to Roberts, he recommended Bancroft's relocation due to his familiarity with the "regulatory environment of St. Lucia."  (Docket No. 82, p. 33).

received approval from the St. Lucia Ministry of Finance ("the Regulator").[5]  (Docket No. 79, p. 64, Docket No. 80, p. 51). Hewanorra Corporate Services Limited, a company owned by John, was retained to serve as Bancroft's registered agent in St. Lucia.  (Docket No. 79, pp. 17, 67, Docket No. 80, pp. 3-4, Docket No. 82, p. 33).

10.  In 2006, the International Insurance Act ("Insurance Act") of St. Lucia was amended to allow international insurance companies to offer a new line of business that is based on one entity, the incorporated cell company ("ICC"), being licensed to provide insurance through a separate company which is called an incorporated cell ("IC").[6]  (Docket No. 76-2, Docket No. 82, p. 155).  See also www.stluciaifc.com.

11.  To guarantee an ICC's control over its ICs, Section 17 of the amended Insurance Act provides that "the majority of directors in an [IC] shall be directors of the [ICC] to which it is linked."  In addition, the regulations which were promulgated

---

[5]The documents which must accompany an application to become a director of an insurance company domiciled in St. Lucia include an extensive Due Diligence Questionnaire in which the applicant must provide personal identifying information, educational, employment, military and litigation history, any encounters with law enforcement, professional associations, business affiliates, location of assets and character references, as well as a Statutory Declaration set forth in St. Lucia's international insurance regulations in which the applicant must attest to his or her honesty and integrity.  (Pl's Exh. 31).

[6]The effective date of the amended Insurance Act was April 30, 2007.  (Docket No. 82, p. 155).

to implement the 2006 amendments to the Insurance Act include the following:

\* \* \*

9. The conduct of insurance business and governance of the affairs of each [IC] is the responsibility of the [ICC].

\* \* \*

12. (1) An [ICC] and each [IC] that is linked to it shall enter into an operating agreement specifying such matters as the parties determine to govern the relationship, but including the amount of capital, the mechanism for approval of accepting and underwriting risk, the types of investments allowed, the payment of dividends and other distributions, the manner of transferring capital stock of the [IC], and matters affecting the financial affairs of the [IC].

\* \* \*

International Insurance Regulations 2007, No. 32.

12. To establish an IC in St. Lucia, an ICC must file an application with the Regulator. If approved, a certificate of international insurance is issued and the right to sell insurance is transferred to the IC under the ICC's license. An IC's license rights are completely derivative of the license rights of the ICC to which it is linked, and the ICC remains responsible for the IC's compliance with St. Lucia's amended Insurance Act and its implementing regulations. (Docket No. 79, pp. 20-21, 26).

13. In late 2007, Bancroft decided to offer insurance to United States companies that elected not to participate in its group plan utilizing the ICC/IC model. As a result, ICMC's management responsibilities were expanded to include the

7

formation and management of Bancroft's ICs. ICMC's right to manage Bancroft's ICs was derived entirely from Bancroft's delegation of that authority to ICMC pursuant to the Management Agreement and the parties' subsequent course of dealing. (Docket No. 76-10, p. 59, Docket No. 79, p. 36, Docket No. 82, pp. 44-46, 61-62).

14. Among other things, ICMC was responsible for securing operating agreements with Bancroft's ICs to comply with Section 12 of the regulations implementing the amended Insurance Act and for filing the operating agreements with the Regulator. ICMC also was responsible for preparing the required semi-annual statements for each IC showing their financial positions. These statements then become part of the consolidated semi-annual statement which Bancroft, as the ICC, is required to file with the Regulator. (Docket No. 79, pp. 27, 29-30, 36, Docket No. 82, pp. 44-46, 61-62).

15. ICMC's operations were not computerized. Rather, ICMC conducted its business utilizing paper files. (Docket No. 83, p. 64). In early 2008, in conjunction with its decision to offer insurance through the ICC/IC model, Bancroft hired Sigel's sister, Gail Sigel, an information technology consultant, to review ICMC's recordkeeping, accounting practices and technology. (Docket No. 78, p. 4). Based on Ms. Sigel's review, a joint decision was reached to dedicate a computer server at ICMC solely to Bancroft's records. No records belonging to ICMC or any of

8

its other clients were to be stored on this server. Ms. Sigel then upgraded the operating system on the dedicated server and instructed one of ICMC's employees to begin scanning Bancroft's records onto the server. Ms. Sigel also installed an external hard drive at ICMC for the purpose of backing up Bancroft's records; a router to allow people to remotely access the network and the Internet; and a Dell computer to which access was limited to an accounting firm hired by Bancroft to ensure that ICMC was properly utilizing its QuickBooks program. No software was installed on the Dell computer. Its sole purpose was to permit the accounting firm to access Bancroft's QuickBooks files.[7] (Pl's Exh. 11, Docket No. 78, pp. 7-9, 14-15).

16. In 2008 and 2009, ICMC and The Roberts and Patton Law Firm formed 10 ICs for Bancroft including A&B IC, ABSi IC, Joyce IC, CDG IC, Nottingham IC, West IC, Diva IC and three other ICs that are no longer in existence.[8] (Docket No. 80, p. 15). The owners of Joyce IC and CDG IC were introduced to Bancroft by

---

[7]QuickBooks is financial management software that was developed by Intuit. The initial release of QuickBooks gave small business owners a system that required little or no accounting experience, yet helped provide financial structure and compliance. Subsequent releases provide increased functions to address the dissatisfaction of professional accountants with the software as initially released who often provide small businesses with monthly and year-end services requiring data from the software used for day-to-day operations by the business. www.wikipedia.org

[8]The fee paid to ICMC by Bancroft for forming an IC was $20,800. (Pl's Exh. 47, Docket No. 82, p. 45).

9

Roberts who had provided services for the owners for "many, many years." (Docket No. 79, p. 53, Docket No. 81, p. 117, Docket No. 82, p. 50). In this regard, one of the services that ICMC was paid to provide for Bancroft was business development. (Docket No. 81, p. 117, Docket No. 82, p. 92).

17. At the time of Bancroft's decision to offer insurance utilizing the ICC/IC model, Roberts informed Sigel that it would be necessary for him to become a director of Bancroft's ICs in order for ICMC to manage them. To become a director of Bancroft's ICs, however, Roberts first had to become a director of Bancroft. Although he never filed an application, completed the necessary paperwork, underwent a criminal background check or took any other step to become a director of Bancroft, Roberts told Sigel and Barros in early 2008 that he had been approved by the Regulator. (Docket No. 79, p. 18, Docket No. 82, p. 51). He also told the shareholders of Joyce IC, CDG IC, Nottingham IC, West IC, A&B IC and ABSi IC that he was a director of Bancroft. Based on that representation, the shareholders of those ICs elected Roberts to their boards. (Docket No. 82, p. 52).

18. In the summer of 2008, Roberts was designated a beneficiary of the Bancroft Trust by Sigel. Prior to this designation, Roberts was compensated for the services he provided for Bancroft through The Roberts and Patton Law Firm. After the designation, Roberts was paid $20,000 per month for his services by the Bancroft Trust. (Docket No. 82, pp. 18, 154).

19.  In March 2009, CBIZ MHM ("CBIZ"), a public accounting firm, was retained by Bancroft to review ICMC's accounting records and assist Bancroft in a regulatory audit being conducted by the St. Lucia Auditor for the year 2008.  Stuart Anolik ("Anolik"), CBIZ's Managing Director in charge of international taxation, was responsible for Bancroft's account.  In attempting to review ICMC's accounting records, CBIZ experienced difficulty getting information.  ICMC provided the information in bits and pieces.  Moreover, the information provided was incomplete and, in some instances, inaccurate.  (Docket No. 81, pp. 20-22, 51). For example, when CBIZ was provided with Bancroft's records that were to be scanned onto the dedicated server by an employee of ICMC in accordance with Ms. Sigel's instruction in 2008, all of the folders were listed on the server, but approximately 50% of the documents that should have been in the folders were missing.[9] In addition, ICMC did not provide CBIZ with executed loan documents,[10] transfer of share documents for the ICs, fully

---

[9]ICMC's employee ceased scanning Bancroft's records onto the dedicated server upon Ms. Sigel's completion of her consulting contract with Bancroft in August 2008.  (Docket No. 78, p. 18, Docket No. 83, p. 64).

[10]

executed tax returns for Bancroft and its ICs, and actuarial reports supporting the premiums being paid by Bancroft's insureds to ensure the deductibility of the premiums.[11]  (Docket No. 81, p. 28).

20.  CBIZ's review of ICMC's accounting practices with respect to Bancroft's operations revealed, among others, the following deficiencies: ICMC utilized QuickBooks, which should be a book of original entry for a company's day-to-day business transactions, merely as a check writing tool; █████████

---





21.  As early as the summer of 2009, Bancroft expressed
"grievous dissatisfaction" with ICMC's management and
administrative services; the principals of Bancroft and ICMC
began discussing termination of the Management Agreement; and
Bancroft decided to hire CBIZ to replace ICMC as its management
company.  On October 6, 2009, Barros sent a memo to Roberts
confirming (a) Bancroft's termination of the Management Agreement
with ICMC,[13] and (b) ICMC's agreement to provide two employees on



[13]In light of the 90 days' written notice mandated by the
Management Agreement, the effective date of Bancroft's
termination of ICMC as its management company was January 6,

a temporary basis to assist Bancroft in the transition to CBIZ.[14]
(Pl's Exh. 26, Docket No. 82, pp. 64-65, Docket No. 81, p. 25).
At this time, Roberts' status as a beneficiary of the Bancroft
Trust was terminated by Sigel and he received no further payments
from it. (Docket No. 82, p. 69).

22. In accordance with Barros's October 6, 2009 email,
Bancroft paid the full salaries of two ICMC employees for the
months of October and November 2009 at a cost of approximately
$6,000 per month. (Pl's Exhs. 68 & 69, Docket No. 81, pp. 92-93,
Docket No. 82, pp. 66-67). Previously, ICMC was paid
approximately $24,000 per month for its management services which
included: (a) 80% of the salaries of three ICMC staff members,
(b) hourly rates for services provided by Schwab and another ICMC
employee, Robert Spadafore ("R. Spadafore"), (c) 80% of ICMC's
overhead expenses and (d) a payment for profit. (Pl's Exhs. 70,
71 & 73, Docket No. 81, pp. 94-96, Docket No. 82, p. 67).

23. At the time of Bancroft's written notice of termination
of the Management Agreement with ICMC, The Roberts and Patton Law
Firm was in the process of dissolution. (Docket No. 82, p. 140).
More than a year earlier, the Supreme Court of Pennsylvania had

_____

2010. (Docket No. 80, p. 18).

[14]It was the intent of Bancroft and CBIZ that CBIZ would
take over as its management company on July 1, 2009. However,
due to the inadequacy of the records and information being
provided to CBIZ by ICMC, as well as ICMC's lack of cooperation,
the transition was delayed to the fourth quarter of 2009.
(Docket No. 81, pp. 25-26).

14

notified Roberts of his transfer to inactive status due to his failure to comply with the rules of the Pennsylvania Continuing Legal Education Board. As of September 6, 2008, Roberts' license to practice law in Pennsylvania, the only State bar to which he was admitted, was suspended.[15] (Pl's Exh. 41). Nevertheless, on September 10, 2009, Roberts signed a tax return prepared by ICMC for A&B IC declaring under oath that he was a member of the Pennsylvania bar in good standing.[16] (Pl's Exh. 52, Docket No. 76-10, p. 53).

24. On November 10, 2009, Anolik wrote to Roberts requesting delivery of Bancroft's records by November 13, 2009 to enable CBIZ to assist in the regulatory audit of Bancroft for the year 2008.[17] (Pl's Exh. 18, Docket No. 81, p. 20). Roberts

---

[15]Apparently, Roberts has no intention of taking steps to reinstate his license because he is "essentially retired." (Docket No. 82, p. 140).

[16]During the preliminary injunction, Bancroft presented evidence from which the inference could be drawn that Roberts continued to collect legal fees from Bancroft after the suspension of his only license to practice law. (Pl's Exhs. 42, 75, 76 & 78). Robert denies collecting fees for legal services after the suspension of his license, and the Court declines to make any findings on the issue based on the present record.

[17]With regard to Bancroft, Anolik requested (a) the certificate of incorporation; (b) the memorandum of association or bylaws; (c) all duly adopted minutes or resolutions of the members or directors; (d) all regulatory filings; (e) all applications and approvals of members and directors; (f) copies of audited financial statements since inception; (g) copies of all Federal corporate income tax returns for Bancroft ICC; (h) reinsurance or other agreements; and (i) the original or a copy of the ICC license. As to Bancroft's ICs, Anolik requested (a) the applications and approvals for transfer of shares; (b) the

15

responded by email, indicating that he had the documents and would send them out that week. (Pl's Exh. 19).

25. On November 26, 2009, Anolik sent another email to Roberts regarding matters that had been raised as a result of the regulatory audit of Bancroft for the year 2008. Among other things, Anolik requested audited financial statements for each IC. (Pl's Exh. 20). Roberts responded to this request as follows: "lets (sic) discuss as (sic) wonder if Audited Statements are needed according to St. Lucia law. Do the management agreements call for audited statements? I am not sure they do."[18] (Pl's Exh. 21).

26. Unbeknownst to Bancroft, in the fall of 2009, ICMC initiated the steps necessary to form Lago Insurance Company ("Lago") to operate as an ICC in St. Lucia. The ostensible owner of Lago is Emile Spadafore, the brother of ICMC Vice President R. Spadafore, who had no experience in the insurance industry prior

---

approval and license to handle insurance matters; (c) the business plans; (d) the actuarial and underwriting reports; (e) the operating agreements; (f) the financial statements since each inception; (g) the reinsurance and other agreements; and (h) the tax returns since inception. (Pl's Exh. 18).

[18]Being a purported expert in international insurance law, and, in particular, the "regulatory environment" of St. Lucia, it is inconceivable that Roberts did not know whether the financial statements of ICs must be audited.

16

to forming Lago.[19]  (Docket No. 76-10, pp. 31-32, Docket No. 82, p. 72).

27.  On December 9, 2009, despite Bancroft's written notice of termination of the Management Agreement on October 6, 2009, ICMC purported to give Bancroft 90-days' written notice of its termination of the Management Agreement.  (Docket No. 82, p. 60). Roberts' claim that he did not receive Bancroft's notice of termination in October 2009 is incredible.  (Docket No. 82, p. 109).  Roberts admits that discussions regarding Bancroft's termination of ICMC began in the summer of 2009, and that the only payments ICMC received from Bancroft after the termination notice were the salaries of the two ICMC employees who assisted in the transition from ICMC to CBIZ during the months of October and November 2009.  (Docket No. 82, pp. 64-67, 116, 150).  In addition, an email from Barros to Roberts on October 2, 2009 noted Barros's anticipation that the two ICMC employees assisting in the transition to CBIZ would be needed "through October and possibly beyond."  (Dfs' Exh. HH).

28.  The day following ICMC's purported written notice of termination of the Management Agreement, Barros sent a letter to ICMC demanding the delivery of all Bancroft records in its possession to CBIZ in accordance with Section 7 of the Management Agreement.  (Dfs' Exh. H).

---

[19]At the time of its formation, ICMC was retained to serve as Lago's management company.  (Docket No. 76-10, p. 32).

29.  A week later, ICMC sent the following letter to Matthew Brown, a tax attorney in California who refers business to Bancroft:

Dear Mr. Brown:

We wanted to let you know that Intercontinental Captive Management Company, Ltd. will no longer be acting as the U.S. Manager for Bancroft Life & Casualty ICC, Ltd.

We terminated our Management Agreement due to Bancroft's: (1) failure to pay on a timely basis several invoices for services previously rendered; and (2) decision to move to a new direction, which we did not feel we could support.

We sent the contractually required written notification to Bancroft Life & Casualty ICC, Ltd. on December 9, 2009.

(Pl's Exh. 58).

30.  The letter sent to Attorney Brown also was sent to other referral sources, as well as Bancroft's insureds, service providers and the owners of Joyce IC and CDG IC.  A similar letter was sent to the Regulator in St. Lucia.[20]  (Pl's Exh. 60, Docket No. 82, pp. 108-12).

31.  Attorney Brown responded to ICMC's December 16th letter by sending the following e-mail to Roberts:

Just a friendly suggestion from one lawyer to another.  I received a panicked phone call from Rick Williams, an AMR I introduced to the Bancroft program.[21]  He was very concerned

_____

[20]The letter to the Regulator omitted the claim that one of the reasons for ICMC's purported termination of the Management Agreement was Bancroft's alleged "decision to move to a new direction, which we did not feel we could support."  (Pl's Exh. 60).

[21]An Association Member Representative, or AMR, is a representative of an association benefit group that refers

18

about the note your office manager sent out that suggested
Bancroft was moving in a bad direction and had unpaid
invoices. It painted Bancroft in a very negative light
(although your verbal comments to me were far less
negative).

It seems you have chosen to burn your bridges with Brad and
Phil, which is certainly your choice. But that note has
probably created a lot of problems for them if Rick
Williams' response is any indicator. At least I am in the
middle to provide assurances to Rick. But there are
probably AMRs out there who don't have someone with my
credibility to give them assurances.

I have heard rumors about Phil's propensity to sue (although
they are only rumors), so if I were in your shoes, I would
send out an apology and retraction ASAP just to try to mend
fences and avoid a potential lawsuit.

If my office manager ever sent out a letter like that about
a former client, I would fire her immediately (it is in poor
taste and violates confidentiality).

I hope this doesn't come across as scolding. I like you,
Brad, and Phil as people, and as an outsider, I am simply
doing what I can to try to help you all avoid further
conflict.

(Pl's Exh. 59).[22]

Despite Attorney Brown's concern and suggestion, Roberts took no

action to apologize for, or retract, ICMC's December 16, 2009

letter. (Docket No. 82, p. 113).

---

clients to Bancroft for a fee. (Docket No. 81, p. 74).

[22]On the same day, Attorney Brown sent the following email
to Barros:

Hope I'm not intruding too much, but Tom's note created
problems for me. I think I have been able to adequately
address Rick Williams' concerns, but a retraction from Tom
sure would help me (and probably you as well).

(Pl's Exh. 59).

32. When asked to explain the purpose of ICMC's December 16th letter to Bancroft's insureds, referral sources, service providers and the owners of Joyce IC and CDG IC, Roberts testified that it was simply to notify them of ICMC's termination of the Management Agreement with Bancroft. Therefore, future communications with Bancroft should be made directly, not through ICMC. (Docket No. 82, pp. 110-11). Roberts' explanation is incredible. ICMC's December 16th letter went far beyond mere notice of the need to communicate with Bancroft directly in the future and was intended to harm Bancroft by suggesting to its clients and business affiliates that it was experiencing financial difficulties and engaging in unethical conduct.[23]

33. On December 17, 2009, ICMC sent an invoice to Joyce IC for its 2010 management fee in the amount of $18,500.00. Despite the fact that ICMC would no longer be serving as Bancroft's

---

[23]The pretextual nature of Roberts' explanation of the purpose of ICMC's December 16th letter is further illustrated by his explanation of the statement in the letter regarding Bancroft's decision to move in a direction that ICMC could not support. Specifically, Roberts testified that Bancroft was "getting involved in lines of business that we could not support." When asked to identify those lines of business, Roberts testified: "Life insurance strategies, in particular." (Docket No. 82, p. 110). During subsequent testimony, however, Roberts admitted that Bancroft had changed its name from Bancroft Property & Casualty Insurance Company to Bancroft Life & Casualty Insurance Company in 2006; that Bancroft had been offering life insurance since at least 2007; and that Roberts, himself, had offered opinions supporting Bancroft's status as a life insurance company. (Docket No. 76-10, p. 64).

management company in 2010, Joyce IC paid the invoice on January 10, 2010 by check made payable to ICMC.[24]  (Pl's Exh. 22).

34.  The directors of Joyce IC were John Joyce, one of its owners, Roberts and Barros.  On January 5, 2010, one day before the effective date of ICMC's termination as Bancroft's management company, Roberts scheduled a board meeting of Joyce IC without notice to Bancroft.  Thus, the only directors to attend the meeting were John Joyce and Roberts.  Among other things, a resolution was made during the meeting to transfer the registration of Joyce IC to Lago which, at that time, had not been approved by the Regulator.  (Pl's Exh. 35, Docket No. 82, pp. 71-74, 76).  On the same day, Roberts scheduled a board meeting of CDG IC without notice to Bancroft and an identical resolution was made.[25]  (Pl's Exh. 2, Docket No. 82, p. 69).

35.  On January 5, 2010, ICMC sent an invoice to Joyce IC in the amount of $4,307.14 for the asset based fees due to Bancroft

---

[24]The Injunction Defendants assert that, unlike Bancroft's other ICs, the annual management fees of Joyce IC and CDG IC were paid to ICMC because ICMC introduced the shareholders of these ICs to Bancroft.  Bancroft disputes this assertion and the Court declines to make a factual finding regarding the dispute on the present record.  In any event, the dispute is immaterial with respect to the invoice identified as Plaintiff's Exhibit 22.  CBIZ replaced ICMC as Bancroft's management company in 2010.  Therefore, there was no basis for ICMC to collect a management fee for 2010 from Joyce IC and CDG IC which are linked to Bancroft.

[25]The directors of CDG IC were Ray Hassey, one of its owners, Roberts and Barros.  Due to Roberts' failure to provide notice of CDG IC's January 5th board meeting to Bancroft, Barros also did not attend that board meeting.  (Pl's Exh. 55).

for the third and fourth quarters of 2009. Despite the fact the invoice instructed the recipient to make the check payable to Bancroft, ICMC instructed Joyce IC to make the check payable to ICMC, and Joyce IC complied with the request.[26] (Pl's Exh. 23, Docket No. 81, p. 56).

36. ICMC ceased business activities in January 2010, and, in February 2010, its assets were transferred to IML, a Pennsylvania corporation. IML engages in the same line of business and operates from the same address as its predecessor, ICMC. Moreover, IML's clients are ICMC's former clients and IML is owned by Roberts, Patton, Bailey and Schwab, ICMC's former owners. (Docket No. 82, pp. 10-11, 88, 136-39).

37. On January 15, 2010, Schwab responded to a communication from Bancroft's counsel objecting to ICMC's alleged interference in Bancroft's regulatory audit for year 2008. Among other things, Schwab asserted that ICMC had already provided all the records necessary to the 2008 audit of Bancroft, and that ICMC retained the right to withhold records in its possession which were not necessary to the 2008 audit "as a possessory lien against amounts due under the contract between Bancroft and ICMC." (Pl's Exh. 24).

---

[26]Several months later, ICMC sent an invoice to Bancroft for $97,091.18, after deducting the $4,307.14 paid by Joyce IC to ICMC for the asset based fees owed to Bancroft for the third and fourth quarters of 2009. (Dfs' Exh. F). Thus, although ICMC intercepted this payment to which it was not entitled, ICMC notes that Bancroft was eventually given credit for it.

38. Further communications between Bancroft and ICMC relating to ICMC's failure to return all of Bancroft's records followed. By letter to Schwab dated January 29, 2010, Bancroft's counsel confirmed prior notification that a Bancroft agent would be at ICMC's offices to pick up "seven ... bankers boxes of Bancroft documents." Counsel also took issue with Schwab's apparent claim that ICMC was not responsible for preparation of quarterly reports and year-end financial statements for Bancroft and its ICs; that ICMC had forwarded all tax returns to Barros to be signed and filed; and that ICMC had not been advised of necessary corrections to Bancroft's most recent semi-annual report. Finally, Bancroft's counsel stated that the "pressing issue" was ICMC's continued possession of the server which had been dedicated to Bancroft's records in early 2008. Counsel requested the immediate return of the server and all of its contents.[27] (Pl's Exh. 62).

39. On February 3, 2010, Schwab responded to counsel's January 29th letter representing that ICMC was no longer retaining Bancroft records as a lien for the approximately $100,000 alleged to be owed to ICMC by Bancroft, and that all

---

[27]Bancroft and ICMC both claim to be the owner of the server at issue. However, for purposes of its request for preliminary injunctive relief, Bancroft is not pursuing its claim of ownership. Rather, it is seeking the information on the server which ICMC concedes belongs to Bancroft pursuant to the terms of the Management Agreement.

records pertaining to Bancroft in ICMC's possession had been returned. (Pl's Exh. 25).

40. During the regulatory audit of Bancroft being conducted by St. Lucia's Auditor for the year 2008, which was completed by March 2010, Bancroft discovered that Roberts had never submitted an application to the Regulator to become a director of Bancroft. Therefore, Roberts had never received the Regulator's approval and the boards of Bancroft's ICs on which Roberts sat were not in compliance with Section 17 of the amended Insurance Act requiring the majority of an IC's directors to be directors of the ICC to which it is linked. (Docket No. 79, pp. 18, 68, Docket No. 81, p. 91).

41. Roberts' claim that he was approved as a director of Bancroft in early 2008, despite his admitted failure to submit an application and the necessary paperwork,[28] undergo a criminal background check and receive the Regulator's approval, is totally lacking in credibility. In an application for registration of a Bancroft IC that was submitted to the Regulator in the latter part of 2008, the business plan which was prepared by ICMC states that Barros and Sigel have served as directors of Bancroft since its formation in 2003 and that John has served as a director

_____

[28] In this regard, the Court notes that ICMC maintained copies of the Due Diligence Questionnaire which must accompany an application for a directorship of an insurance company domiciled in St. Lucia and had provided the document to potential directors of Bancroft ICs. (Docket No. 76-9, p. 95).

24

since the company's relocation to St. Lucia in 2006. There is no mention of Roberts being a director of Bancroft. (Pl's Exh. 48).

42. Moreover, as noted previously, insurance companies domiciled in St. Lucia are required to file semi-annual financial reports with the Regulator which must be signed by a director. In May 2009, Bancroft received a financial report that had been prepared by ICMC for the periods ending June 30, 2008 and December 31, 2008 and signed by Roberts as a purported director of Bancroft. Upon receipt, John promptly brought to Roberts' attention the fact that he was not a Bancroft director, and John requested an unsigned copy of the financial report to be submitted to the Regulator with the signature of an actual Bancroft director.[29] Roberts complied with John's request

---

[29]On the original return forwarded to Bancroft by ICMC, John made the following notation: "Signed by Tom Roberts as director which he is not. Requested fresh copies." (Pl's Exh. 33).

without objection.[30]  (Pl's Exhs. 33 & 34, Docket No. 76-9, pp. 40-42, Docket No. 80, pp. 12-14).

43.  The regulatory audit of Bancroft for the year 2008 also revealed ICMC's failure to secure operating agreements with any of Bancroft's ICs as required by Section 12 of St. Lucia's international insurance regulations (Docket No. 80, pp. 17-18, Docket No. 82, p. 47), as well as ICMC's failure to prepare semi-annual financial reports for any of Bancroft's ICs for the periods ending June 30, 2009 and December 31, 2009.  (Docket No. 80, pp. 18-20).  Finally, the 2008 regulatory audit revealed ICMC's failure to secure the execution of many key corporate documents for Bancroft, including resolutions, meeting minutes and insurance policies.  (Docket No. 80, pp. 20-21).

44.  By letter dated March 4, 2010, Bancroft notified the shareholders of its ICs regarding their non-compliance with St. Lucia's amended Insurance Act and its implementing regulations.

_____

[30]In support of his claim that he was a director of Bancroft, Roberts relies on a cover letter to the application for incorporation of Joyce IC which was submitted by Hewanorra Corporate Services Limited to the Regulator on December 16, 2008. Although the cover letter identifies Roberts as a director of the proposed IC (Dfs' Exh. A), Roberts' reliance on this document to support his claim of being a duly approved director of Bancroft is unavailing.  The cover letter was nothing more than a declaration of intent, i.e., a proposal or business plan indicating an intention to include Roberts on the board of directors of Joyce IC if it was approved by the Regulator. (Docket No. 80, pp. 9-11).  The cover letter simply cannot be construed as a substitute for compliance with St. Lucia's stringent requirements for approval to serve as a director of an insurance company domiciled in St. Lucia.

26

Bancroft requested documents from the ICs and sought to convene a meeting with each IC to address the non-compliance issues. (Pl's Exh. 4). None of the shareholders of Joyce IC and CDG IC responded to the letter directly. Rather, ICMC responded on their behalf, notwithstanding the fact that two months had passed since its termination as Bancroft's management company.[31] (Docket No. 80, p. 22).

45. With respect to Joyce IC, ICMC sent the following letter to Bancroft's staff attorney, Robin D. Benjamin ("Benjamin"), on March 17, 2010:[32]

> RE: Joyce Insurance Group IC, Ltd.
>
> Dear Mr. Benjamin:
>
> This correspondence is in response to your letter of March 4, 2010 to Mr. Joyce.
>
> Please understand that Joyce Insurance Group was a client of ICMC prior to becoming an IC and we continue to act as the U.S. Manager of Joyce Insurance Group IC, Ltd. ("Joyce IC") and have been authorized to provide this response.
>
> Joyce IC has engaged Demar & Associates, LLC to compile its unaudited financial statements for the year 2009. St. Lucia approved auditor, Tom Hughan, of Cunningham, Hughan & Co., PC, is doing an audited financial statement which we expect

---

[31] In this connection, Roberts admits that he had sent a memo to the owners of Joyce IC and CDG IC "telling them that there was no need to communicate with Bancroft." (Docket No. 82, p. 89, Docket No. 76-10, p. 60). It is not clear from the present record whether ICMC responded to Bancroft's March 4th correspondence on behalf of any other IC linked to Bancroft.

[32] Although the Injunction Defendants assert that ICMC ceased business activities in January 2010, this is one of several letters in the record that were written to Bancroft on ICMC letterhead after its alleged dissolution.

to provide to you by March 31, 2009 (sic). Joyce IC is providing this audited financial statement even though there is no statutory or regulatory requirement to do so. Thus, the items you requested, and numbered 1 through 14, have already been supplied to Joyce IC's accountants.

As to your No. 15, Joyce IC has already held its Fall Board Meeting. The Board made the following resolution at that meeting:

RESOLVED, THAT a request to transfer the registration to another ICC that holds a license in St. Lucia should be submitted to the Director for approval.

Sincerely,
ICMC.

(Pl's Exh. 3, Docket No. 79, p. 37).

On the same day, a virtually identical letter was sent to Bancroft by ICMC on behalf of CDG IC.[33] (Pl's Exh. 2).

46. Upon receipt of ICMC's March 17th letters on behalf of Joyce IC and CDG IC, John was "quite shocked, surprised" by ICMC's claim that it continued to be the management company for these ICs which were operating under Bancroft's insurance license; by ICMC's representation that meetings of their boards of directors had been held without notice to Bancroft; and by ICMC's representation respecting the resolution to transfer

---

[33]On March 31, 2010, ICMC sent the following documents to Bancroft for Joyce IC and CDG IC: 2009 bank statements; minutes of shareholder and directors' meetings for 2009; share certificates for each shareholder; the insurance policies that were issued to these ICs; participation agreements showing each IC's assumption of third-party re-insurance; and unaudited financial statements for the period ending December 31, 2009 (which ICMC claimed to have filed with the Regulator as required by the amended Insurance Act). (Dfs' Exh. X).

registration of Joyce IC and CDG IC to another ICC, i.e., Lago.
(Docket No. 80, pp. 23-24).

47.   In response to Bancroft's objections to ICMC's interference with its attempts to bring Joyce IC and CDG IC into compliance with St. Lucia's amended Insurance Act and implementing regulations, ICMC sent the following letter to Bancroft on April 14, 2010:

> Mr. Benjamin,
>
> It is Bancroft that is wasting everyone's time, not ICMC. Your letter is full of misstatements of fact and does not merit a detailed response.
>
> Our position remains unchanged and we will continue to act in the best interests of our clients.  We will take whatever steps are necessary to ensure that they remain in full compliance with the law, both in St. Lucia and elsewhere, and to the extent that this involves Bancroft, you or your colleagues will be advised as appropriate.[34]
>
> In the meantime, I respectfully suggest that Bancroft stop this incessant harassment of ICMC and our clients.
>
> Stewart A. Schwab

(Pl's Exh. 5).

48.   Two days later, John, on behalf of Hewanorra Corporate Services Limited, Bancroft's registered agent in St. Lucia, sent

_____

[34]Assuming ICMC was taking steps to bring Joyce IC and CDG IC into compliance with the amended Insurance Act and its implementing regulations, it could not accomplish compliance without Bancroft's active involvement.  The operating agreements had to be signed by Bancroft; the ICs' financial statements had to be reviewed by Bancroft and incorporated into Bancroft's consolidated financial statement; and an additional Bancroft director had to be appointed to the boards of Joyce IC and CDG IC.

a letter to the Regulator regarding the non-compliant status of Joyce IC. First, John noted that the board of directors of Joyce IC consisted of John Joyce, Roberts and Barros, and that only Barros was a director of Bancroft. As a result, the board of Joyce IC was in violation of Section 7 of the amended Insurance Act which requires a majority of the directors of an IC to be directors of the ICC to which it is linked. Next, John noted that since the termination of ICMC as its management company, the shareholders of Joyce IC had refused to deal directly with Bancroft and board meetings were held without notice to Bancroft in contravention of Section 9 of St. Lucia's international insurance regulations which provide that the "governance of the affairs of each [IC] is the responsibility of the [ICC]." Next, John noted that Joyce IC had failed to execute an operating agreement with Bancroft in contravention of Section 12 of St. Lucia's international insurance regulations. Finally, John noted that Joyce IC's refusal to cooperate with Bancroft was causing Bancroft's non-compliance with Section 13 of St. Lucia's international insurance regulations which requires an ICC to file semi-annual reports for each of its ICs. John concluded the letter by requesting the Regulator's intervention. (Pl's Exh. 6).

49. The Regulator responded to John's letter on April 28, 2010. After noting Joyce IC's violation of the amended Insurance Act and its implementing regulations, the Regulator stated:

30

\*   \*   \*

It is our view that some documents have not been duly executed by Joyce and hence Joyce may not have been properly set up and organized in the manner prescribed by its By-Laws.  These documents include:

- Opening Resolution of the directors
- Resolution for common seal
- Resolution for share transfer
- Consent to act as director
- Share certificate
- Share transfer
- Applications for share

In light of the above Joyce Insurance Group IC, Ltd. is required to comply with the aforementioned provisions of the statute by **May 31, 2010**.  Your failure to satisfy these requirements will result in the enforcement of Section 21A of the International Insurance (Amendment) Act, No. 44 of 2006.[35]

\*   \*   \*

(Pl's Exh. 7).

50.  On April 30, 2010, Schwab sent a number of documents to Anolik for Joyce IC and CDG IC.  With respect to Joyce IC, the package included (a) the opening resolutions of the directors signed by John Joyce, Joseph Joyce and Roberts but needing the signatures of Sigel and Barros; (b) the resolutions for common seal and share transfer signed by the Joyces and Roberts but needing the signatures of Sigel and Barros; (c) consents to act as directors signed by the Joyces and Roberts but needing the signatures of Sigel and Barros; (d) the share certificates; (e)

---

[35]Section 21A addresses the power of the Regulator to cancel the registration of an IC for, among other things, contravention of the amended Insurance Act.

the consent to act as secretary executed by William Joyce; (f) the share transfers executed by the shareholders and (g) the applications of John Joyce, Joseph Joyce and William Joyce for shares. Schwab's cover letter indicated that a copy of the signed Management Agreement which was agreed to during the organizational directors' meeting on January 22, 2009 also was enclosed, together with a breakdown of the fees paid by Joyce IC. Schwab noted that since Joyce was ICMC's client, the formation fee and management fee were paid directly to ICMC and Bancroft was not billed for those fees.[36] (Dfs' Exh. Z).

51. Upon receipt of the Regulator's April 28th letter, Bancroft called an emergency meeting of the board of Joyce IC for May 12, 2010. However, Roberts unilaterally changed the meeting to May 20, 2010. (Pl's Exh. 27, Docket No. 79, p. 45, Docket No. 80, pp. 33-34, Docket No. 81, pp. 104-05).

52. The May 20th board meeting of Joyce IC was held telephonically. Sigel, Barros, John and Benjamin were present on behalf of Bancroft, while Roberts, Bailey, Schwab, John Joyce, Joseph Joyce and Mike Carroll were present on behalf of Joyce IC and ICMC.[37] Barros chaired the meeting and John recorded the

_____

[36]The cover letter for the package containing the documents for CDG IC was identical with the exception of the shareholders who are Ray Hassey and Joseph Hassey. (Dfs' Exh. Z).

[37]The day before the meeting of Joyce IC's board, Bancroft's counsel contacted Roberts demanding that he "resign" as a purported director of Joyce IC; that he stop interfering with Bancroft's efforts to properly manage Joyce IC; and that he not

minutes. Barros addressed his comments to the Joyces, advising them that Joyce IC was not in compliance with St. Lucia's amended Insurance Act and its implementing regulations, the most important being the requirement that a majority of its directors be directors of Bancroft. In response, Roberts insisted that he was a director of Bancroft. However, he could provide no documentation to support this claim.

53. After much discussion, John Joyce and Barros resolved to remove Roberts from the board of Joyce IC and replace him with John. In light of the contentious situation that existed, John suggested that the meeting be adjourned to confirm the new board in writing. John did not want to take any further action without a "clean break" between the old board and the new board and it was resolved that a meeting of the new board would be held the following week.[38] (Pl's Exh. 36, Docket No. 79, pp. 45-46, Docket No. 80, pp. 34-37, Docket No. 81, pp. 104-06).

54. While he was putting the telephone down after he believed the meeting had been adjourned, John heard Roberts state that the Bancroft directors had left prematurely and the meeting

---

attend the meeting. (Pl's Exh. 50). Nevertheless, Roberts attended the meeting and, in fact, presented his own agenda for the meeting.

[38]Following the May 20th board meeting of Joyce IC, John took the steps necessary to apply to be a director of Joyce IC. His application was approved by the Regulator on June 14, 2010. (Pl's Exh. 61, Docket No. 81, p. 108).

33

would continue. Several days later, John received purported minutes of the May 20th board meeting that had been prepared by Schwab. According to Schwab's minutes, when Sigel and Barros could not achieve their objective of "forcing Tom Roberts to resign and be replaced by Nicholas John," the Bancroft representatives voluntarily left the meeting by hanging up the phone. Schwab then notes that a resolution was passed rejecting the revised operating agreement presented by Bancroft,[39] and that it had been resolved to link Joyce IC to Lago as soon as Lago was in possession of a valid license. (Pl's Exh. 29, Docket No. 80, pp. 37-39, Docket No. 81, pp. 107-08, 125-27).

55. The day after the Joyce IC meeting, Bancroft filed this civil action. Four days later, John notified the Regulator of CDG IC's non-compliance with St. Lucia's amended Insurance Act and its implementing regulations. (Pl's Exh. 37). The Regulator acknowledged receipt of John's letter on June 2, 2010, stating that an investigation was being conducted and that appropriate action would be taken. (Pl's Exh. 38).

56. Due to ICMC's continuing interference with Bancroft's attempts to bring Joyce IC and CDG IC into compliance with St.

[39]In furtherance of his plan to transfer the registrations of Joyce IC and CDG IC to Lago which would be managed by ICMC or IML, Roberts urged the shareholders of Joyce IC, as well as the shareholders of CDG IC, not to sign the operating agreement with Bancroft. (Docket No. 82, p. 54).

34

Lucia's laws and regulations, Bancroft moved for a temporary restraining order ("TRO") on June 24, 2010. (Docket No. 19).

57. In early July 2010, ICMC turned over the Dell computer that had been installed by Ms. Sigel in early 2008 to permit an accounting firm retained by Bancroft to review the QuickBooks files being kept by ICMC. However, the Dell computer is password protected and the Injunction Defendants claim that they do not know the password. As a result, no one has been able to view the files on behalf of Bancroft. (Docket No. 78, p. 15).

58. On July 7, 2010, the day before the scheduled hearing on the TRO, Bancroft and the Injunction Defendants entered into a consent TRO which provides, in relevant part, that to the extent Roberts was or had been a director of any of Bancroft's ICs, the directorships were forever terminated; that during the pendency of the consent TRO, the Injunction Defendants shall not communicate with any of Bancroft's ICs or interfere in any way with Bancroft's efforts to manage its ICs, including Bancroft's efforts to bring its ICs into compliance with all regulatory and contractual requirements; that the Injunction Defendants shall not facilitate, encourage or implement any transfer of the ICs' registrations to another ICC; and that during the pendency of the consent TRO, the Injunction Defendants shall not make any effort

to collect or accept fees from any of Bancroft's ICs. The consent TRO remains in effect.[40]

59. Since the entry of the TRO, Bancroft has been able to communicate freely with the owners of Joyce IC and CDG IC. (Pl's Exh. 30, Docket No. 80, pp. 42-43).

60. On August 12, 2010, Anolik was provided with spreadsheets listing the files and folders on the server at ICMC which had been dedicated to Bancroft's records that had "Bancroft" in the path name.[41] Anolik's review of the spreadsheets revealed documents that had not been provided by ICMC previously, as well as documents that had been requested and never provided, such as loan documents and historical information and bank statements prior to 2008.[42] (Pl's Exh. 67, Docket No.

---

[40]Roberts' concedes that even after his removal as a director of Joyce IC he continued to interfere with Bancroft's attempts to bring Joyce IC into compliance and he did not stop until the TRO was entered. (Docket No. 82, p. 104).

[41]In this connection, Anolik testified during the preliminary injunction hearing that the search of the dedicated server conducted by ICMC was insufficient because it was limited to path names that included "Bancroft." As noted by Anolik, the path name of a document pertaining to the services provided by ICMC to Bancroft may have contained the name of the insured, rather that Bancroft. (Docket No. 81, pp. 39-41). If, in fact, the server had been dedicated solely to Bancroft's records as intended, the Court can discern no reason for limiting the search in any manner.

[42]The Regulator of St. Lucia approved the appointment of Anolik as a director of Bancroft on August 25, 2010. Like all individuals who apply to be a director of an insurance company in St. Lucia, Anolik submitted the required paperwork and underwent a criminal background check. (Pl's Exhs. 85 & 86, Docket No. 76-9, p. 93).

36

81, pp. 33-34, 43-44). Anolik also was provided with the hard drive that had been installed at ICMC's offices by Ms. Sigel in early 2008. Although there are QuickBooks files on the hard drive, Anolik has not been able to open the files because, like the files on the Dell computer turned over by ICMC, they are password protected and ICMC denies knowledge of the password.[43] (Docket No. 76-9, pp. 113-14).

61. Bancroft still has not received many of its records from ICMC, including executed loan documents, share transfer documents for the ICs, fully executed tax returns for Bancroft and its ICs, actuarial reports to support the premiums paid by Bancroft's insureds, historical information prior to 2008, QuickBooks files prior to 2008, schedules prior to 2008, bank statements prior to 2008 and records of any fees collected from Bancroft's ICs for 2010. (Docket No. 81, pp. 30-37, 44-45).

62. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[43]There are QuickBooks files on the hard drive which contain the word "RESTORED" in the path name. In attempting to explain this designation, Schwab testified that the word "RESTORED" is added to a QuickBooks file's path name whenever a change is made to the file. Anolik characterized this explanation as a "ridiculous assertion." (Docket No. 76-9, p. 114).

[black redaction bars]

## CONCLUSIONS OF LAW

Based on the foregoing findings of fact, the Court reaches
the following conclusions of law:

63.  In order to obtain a preliminary injunction, the moving
party must demonstrate "(1) the reasonable probability of
eventual success in the litigation and (2) that the movant will
be irreparably injured *pendente lite* if relief is not granted.
Moreover, while the burden rests on the moving party to make
these two requisite showings, the district court 'should take
into account, when they are relevant, (3) the possibility of harm
to other interested parties from the grant or denial of the
injunction, and (4) the public interest.'" Bennington Foods LLC
v. St. Croix Renaissance Group, LLP, 528 F.3d 176, 179 (3d Cir.
2008), *quoting* Instant Air Freight Co. v. C.F. Air Freight, Inc.,
882 F.2d 797, 800 (3d Cir.1989).

## Return of Bancroft's Property

64. Turning first to Bancroft's request for preliminary injunctive relief requiring the Injunction Defendants to immediately deliver to Bancroft the remainder of its property still in ICMC's possession, this request is based on Bancroft's conversion claim.

65. Under Pennsylvania law, conversion is the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification. McKeeman v. Corestates Bank, N.A., 751 A.2d 655, 659 n. 3 (Pa.Super.2000).

66. Based on the evidence presented during the preliminary injunction hearing, the Court concludes that Bancroft has made a *prima facie* showing that it will succeed on the conversion claim. See Highmark, Inc. V. UPMC Health Plan, Inc., 276 F.3d 160, 173 (3d Cir.2001)(On an application for preliminary injunction, the plaintiff need only prove a *prima facie* case, not a certainty that he or she will win). Thus, the first requirement for issuance of a preliminary injunction has been met.

67. Despite representations by the Injunction Defendants on multiple occasions that all of Bancroft's records in ICMC's possession had been turned over, Bancroft continued to receive records up to the time of the preliminary injunction hearing. Moreover, the external hard drive and Dell computer delivered to

Bancroft by the Injunction Defendants were password protected, effectively denying Bancroft access to the records stored on those devices. Finally, Bancroft presented credible evidence establishing that it has not received numerous documents that should be in ICMC's possession.

68. As to the second element that must be established before a preliminary injunction will be issued, "there must be a showing of immediate irreparable harm, or a presently existing actual threat of harm." Premier Dental Products Co. v. Darby Dental Supply Co., Inc., 794 F.2d 850, 858 (3d Cir.1986), *citing* Continental Group v. Amoco Chemicals Corp., 614 F.2d 351 (3d Cir.1980). As a result of ICMC's recalcitrancy in returning all of Bancroft's records, the Court concludes that Bancroft has shown "a presently existing actual threat of harm." The Regulator is aware of the non-compliance of Bancroft's ICs with the amended Insurance Act and its implementing regulations and has threatened to take action against Joyce IC under Section 21A of the amended Insurance Act which can include the cancellation of its registration as an IC in St. Lucia. In addition, the inability of Bancroft to procure financial reports for its ICs based on the failure of ICMC to turn over its records directly impacts Bancroft's ability███████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████

69.     Turning to the third element to be considered when a

court is determining whether a preliminary injunction should

issue, the Court concludes that the Injunction Defendants will

suffer no harm if directed to return all of Bancroft's records.

Joyce IC and CDG IC continue to be linked to Bancroft.  Thus,

since the termination of the Management Agreement, the Injunction

Defendants have no use for the records of Bancroft pertaining to

those ICs (or any other Bancroft IC).  The claim of the

Injunction Defendants that ICMC continued to be the manager of

Joyce IC and CDG IC after the termination of its Management

Agreement with Bancroft is simply ludicrous.

70.     Finally, the Court concludes that the fourth element to

be considered in connection with a motion for a preliminary

injunction, *i.e.*, the public interest, also weighs in favor of

Bancroft.  The public has a strong interest in seeing that

contract and property rights are respected.  Ride the Ducks of

Philadelphia, LLC v. Duck Boat Tours, Inc., 138 Fed.Appx. 431,

434-35 (3d Cir.2005).

## **Interference with Bancroft's ICs**

71.     As to Bancroft's request for preliminary injunctive

relief enjoining the Injunction Defendants from interfering with

its efforts to manage its ICs, this request is based on

Bancroft's claims for tortious interference with existing and prospective contractual or business relationships, defamation and breach of fiduciary duty. With respect to the first requirement for the issuance of a preliminary injunction, the Court concludes that the evidence presented by Bancroft during the preliminary injunction hearing established a likelihood of success on all three claims.

72. To prevail on a claim for tortious interference with existing and prospective contractual relationships under Pennsylvania law, a party must prove: (1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference. Acumed LLC v. Advanced Surgical Services, Inc., 561 F.3d 199, 212 (3d Cir.2009), citing, Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 530 (3d Cir.1998).

73. Bancroft's ICs have been conducting business under its license. Therefore, the Court agrees with Bancroft that its

42

relationship with its ICs is either contractual or reasonably
likely to become contractual if the Injunction Defendants are
enjoined from interfering in Bancroft's management of its ICs.
(Docket No. 76, p. 55). In addition, the evidence clearly
established the Injunction Defendants' intent to harm Bancroft by
orchestrating the transfer of Joyce IC and CDG IC to Lago, a St.
Lucia ICC in which the Injunction Defendants have an interest.
Further, Bancroft and ICMC were not competitors eliminating any
privilege on the part of the Injunction Defendants to interfere
with Bancroft's ICs.[44] Finally, the Injunction Defendants'
interference with Joyce IC and CDG IC has resulted in damage to
Bancroft. The actions of the Injunction Defendants have severely
impeded Bancroft's ability to bring those ICs into compliance
with St. Lucia's amended Insurance Act and its implementing
regulations, ███████████████████████████████████████████

███████████████████████████████████████

74. In an action for defamation under Pennsylvania law, the
plaintiff has the burden of proving (1) the defamatory character
of the communication; (2) its publication by the defendant; (3)
its application to the plaintiff; (4) the understanding by the
recipient of its defamatory meaning; (5) the understanding by the

---

[44]See Acumed LLC v. Advanced Surgical Services, Inc., 561
F.3d 199, 214-15 (3d Cir.2009)(Pennsylvania has adopted section
768 of the Restatement (Second) of Torts, which recognizes that
competitors, in certain circumstances, are privileged in the
course of competition to interfere with others' contractual
relationships).

43

recipient of it as intended to be applied to the plaintiff; (6) special harm resulting to the plaintiff from its publication; and (7) abuse of a conditionally privileged occasion. See 42 Pa.C.S.A. § 8343(a). In determining whether a statement is defamatory under Pennsylvania law, a court must examine the effect that the statement is calculated to produce and "the impression it would naturally engender, in the minds of the average persons among whom it was intended to circulate." Leder v. Shinfeld, 609 F.Supp.2d 386, 402 (E.D.Pa.2009), *citing* Rockwell v. Allegheny Health, Educ. & Research Foundation, 19 F.Supp.2d 401, 405 (E.D.Pa.1998). A statement is defamatory if it "tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him" or if it "ascribes to another conduct, character or condition that would adversely affect his fitness for the proper conduct of his proper business." Id. at 402, *citing*, Maier v. Maretti, 671 A.2d 701, 704 (Pa.Super.1996), *appeal denied*, 694 A.2d 622 (1997).

75. Roberts distributed ICMC's December 16, 2009 letter to Bancroft's insureds, referral sources, service providers and Joyce IC and CDG IC with the intent of disparaging Bancroft by suggesting that it was in financial trouble and engaging in unethical conduct. Moreover, Attorney Brown's emails to Roberts and Barros following his receipt of the letter clearly show his

44

understanding of the letter as defamatory and the special harm resulting to Bancroft as a result of its publication and Roberts' refusal to issue an apology and retraction. Finally, there is no basis for finding the statements in ICMC's December 16th letter to be privileged.

76. Under Pennsylvania law, an agent is a fiduciary with respect to matters within the scope of his agency and is subject to a duty not to act or agree to act during the period of his agency for persons whose interests conflict with those of the principal in matters in which the agent is employed. <u>The Prudential Ins. Co. of America v. Stella</u>, 994 F.Supp. 318, 322 (E.D.Pa.1998). "Fiduciary duty demands undivided loyalty, prohibits conflicts of interest and its breach is actionable." <u>Id</u>.

77. The Court agrees with Bancroft that as its managing agent, ICMC, as well as its principals, Roberts, Patton and Bailey, owed a duty of undivided loyalty to Bancroft,[45] as did Roberts and Patton in their capacity as counsel to Bancroft. (Docket No. 76, p. 57). The Court further agrees with Bancroft that the evidence presented during the preliminary injunction hearing showed numerous breaches of the Injunction Defendants' fiduciary duties to Bancroft, including the publication of

---

[45]<u>See</u> <u>Laborers' Combined Funds of Western PA v. Cioppa</u>, 346 F.Supp.2d 765, 773 (W.D.Pa.2004)("A corporate officer who takes part in the commission of a tort by the corporation is personally liable for that tort.").

45

disparaging communications to Bancroft's insureds, referral
sources, service providers and Joyce IC and CDG IC with the
intent to harm Bancroft; Roberts' holding himself as an approved
Bancroft director when he unquestionably knew he was not; ICMC's
interception of fees due to Bancroft from its ICs; the convening
of board meetings for Joyce IC and CDG IC without notice to
Bancroft; and the attempt to transfer the registrations of Joyce
IC and CDG IC to Lago in which the Injunction Defendants have an
interest while these ICs were linked to Bancroft.

78. Turning to the second requirement to obtain a
preliminary injunction, the Court concludes that Bancroft has
established irreparable harm as a result of the Injunction
Defendants' interference in the management of its ICs. The
actions of the Injunction Defendants can be expected to affect
the good will of Bancroft with its clients, referral sources,
service providers and ICs,[46] as well as its share of the ICC
market.[47] Moreover, the Injunction Defendants' interference with
Bancroft's management of its ICs has resulted in Bancroft's
inability to bring its ICs into compliance with St. Lucia's
amended Insurance Act and international insurance regulations,

---

[46]See Premier Dental Products Co. v. Darby Dental Supply
Co., Inc., 794 F.2d 850, 858 (3d Cir.1986).

[47]See Ride the Ducks of Philadelphia, LLC v. Duck Boat
Tours, Inc., 138 Fed.Appx. 431, 434 (3d Cir.2005).

46

79.  As to the third consideration in granting or denying a preliminary injunction, the Court concludes that the Injunction Defendants will not be irreparably harmed by an order enjoining any further interference with Bancroft's ICs.  Although the owners of Joyce IC and CDG IC were introduced to Bancroft by the Injunction Defendants, ICMC was paid to develop business for Bancroft.  Moreover, as noted by Bancroft, any harm to the Injunction Defendants resulting from an order prohibiting their interference with Bancroft's management of Joyce IC and CDG IC is discounted by their wrongful conduct.  (Docket No. 76, p. 63).

80.  Finally, the Court concludes that the interest of the public is served by deterring the unlawful interference of the Injunction Defendants in Bancroft's management of its ICs.

*William L. Standish*

William L. Standish
United States District Judge


Date: December 21, 2010
Date of Redacted Opinion: January *13*, 2011