IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVNIA

BANCROFT LIFE & CASUALTY          )
ICC, LTD.,                        )
                                  )
        Plaintiff,                )
                                  )
    vs.                           )     Civil Action No. 10-704
                                  )
INTERCONTINENTAL MANAGEMENT       )
LTD. d/b/a INTERNCONTINENTAL      )
CAPTIVE MANAGEMENT COMPANY,       )
LTD., INTERCONTINENTAL            )
MANAGEMENT, LTD., THE ROBERTS     )
AND PATTON LAW FIRM, JOHN R.      )
PATTON, ESQ., GEORGE THOMAS       )
ROBERTS, ESQ., NIGEL BAILEY,      )
CUNNINGHAM HUGHAN & COMPANY,      )
THOMAS HUGHAN, C.P.A., DERNAR     )
& ASSOCIATES, LLC, and DAVID      )
K. DERNAR, C.P.A.,                )
                                  )
        Defendants.               )

## MEMORANDUM

### INTRODUCTION

Before the Court is the motion of Defendants Dernar & Associates, LLC (individually, "D&A") and David K. Dernar, C.P.A. (individually, "Dernar") (collectively, "the Dernar Defendants"), to dismiss the professional malpractice claim asserted against them by Plaintiff, Bancroft Life & Casualty ICC, Ltd. ("Bancroft"), under Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, the motion to dismiss will be granted.

## FACTUAL ALLEGATIONS

The allegations of Bancroft's complaint that are relevant
to the present motion may be summarized as follows:

Bancroft is an insurance company headquartered and licensed
in St. Lucia.  Bancroft offers customized insurance to United
States companies that generally is not available in the
traditional insurance marketplace.  Specifically, Bancroft's
insurance program is a potentially tax advantaged alternative to
self-insuring a company's risk.  (Docket No. 169, ¶ 1).

On October 15, 2004, Bancroft entered into a management
agreement with Defendant Intercontinental Management, Ltd.,
doing business as Intercontinental Captive Management Company,
Ltd. ("ICMC"), to run its day-to-day operations.  Two of ICMC's
principals, John R. Patton, Esquire ("Patton") and George Thomas
Roberts, Esquire ("Roberts"), who held themselves out as
insurance regulatory and tax attorneys, were retained to serve
as Bancroft's outside general counsel.  (Docket No. 169, ¶ 1).

The principals of Bancroft entrusted ICMC with its day-to-
day business and entrusted Patton and Roberts with all of its
regulatory compliance and tax issues.  Rather than serve
Bancroft's best interests, however, ICMC, Patton, Roberts and
ICMC's other principal, Defendant Nigel Bailey, worked against
Bancroft and elevated their own interests above the interests of
Bancroft.  For example, ICMC billed Bancroft for hundreds of

thousands of dollars for services that it either did not perform, or performed so poorly that it was as if it had not performed the services at all. (Docket No. 169, ¶ 2).

D&A is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Murrysville, Pennsylvania. Dernar is a certified public accountant and an owner/employee of D&A. (Docket No. 169, ¶¶ 11-12). The Dernar Defendants were retained to prepare financial statements and semi-annual reports for Bancroft and its captive incorporated cells ("ICs") for submission to the St. Lucia Ministry of Finance, as well as tax returns for Bancroft's ICs.[1] (Docket No. 169, ¶ 189).

In the performance of their accounting services, the Dernar Defendants owed Bancroft a duty to use the skill, prudence and diligence commonly possessed and exercised by members of the accounting profession. (Docket No. 169, ¶ 190). The Dernar Defendants breached their duty to Bancroft by (a) failing to prepare timely and accurate semi-annual reports on behalf of Bancroft and its ICs for submission to the St. Lucia Ministry of Finance, (b) failing to prepare financial statements that

---

[1] Companies with special risk insurance needs may elect to have Bancroft form what is known as a single parent IC. Under this business model, the client actually owns the captive insurance company. However, in order to issue an insurance policy under Bancroft's license, the IC must obtain a certificate of registration to do international insurance business from the government of St. Lucia. This license limits the IC's business activities to those of an IC of Bancroft. The IC also must make an election under 26 U.S.C. § 953(d) to be taxed as a United States taxpayer. Beginning in 2008, ICMC, on Bancroft's behalf, purported to form ten ICs. (Docket No. 169, ¶¶ 24-25).

accurately reflected Bancroft's income, expenses, reserves, assets and liabilities, and (c) failing to prepare timely and accurate tax returns for Bancroft's ICs.  Upon information and belief, the Dernar Defendants prepared financial statements, semi-annual reports and tax returns from accounts and records supplied by ICMC which the Dernar Defendants knew, or reasonably should have known, were inaccurate, incomplete or otherwise unsatisfactory.  The Dernar Defendants' breaches have caused Bancroft to be out of compliance with the laws and regulations governing insurance companies in St. Lucia.[2]  (Docket No. 169, ¶¶ 193-95).

## LEGAL STANDARD

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading that states a claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of Rule 8(a)(2) is to give the defendant fair notice of what the claim is and the grounds upon which it rests.

In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the United States Supreme Court abrogated the oft-repeated standard

---

[2] Pursuant to Pa.R.Civ.P. 1042.3, counsel for Bancroft attached a Certificate of Merit to the Amended Complaint for each of the Dernar Defendants certifying that "an appropriate licensed professional has supplied a written statement to the undersigned that there is a basis to conclude that the care, skill or knowledge exercised or exhibited by [Dernar and D&A], in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm.  (Docket No. 169, pp. 13-16).

enunciated in Conley v. Gibson, 355 U.S. 41, 45-46 (1957) for dismissal of a complaint for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6), i.e., that a complaint cannot be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Following Twombly, a plaintiff must "nudge[] [his or her] claims across the line from conceivable to plausible" in order to survive a motion to dismiss. 550 U.S. at 570. See also Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir.2008)("After Twombly, it is no longer sufficient to allege mere elements of a cause of action; instead 'a complaint must allege facts suggestive of [the proscribed] conduct.'").

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1950 (2009). Regarding this task, in Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir.2009), the Court of Appeals for the Third Circuit noted that

> "..., after Iqbal, when presented with a motion to dismiss
> for failure to state a claim, district courts should
> conduct a two-part analysis. First, the factual and legal
> elements of a claim should be separated. The District
> Court must accept all of the complaint's well-pleaded facts
> as true, but may disregard any legal conclusions. Id.
> Second, a District Court must then determine whether the

facts alleged in the complaint are sufficient to show that
the plaintiff has a "plausible claim for relief." <u>Id</u>. at
1950.   In other words, a complaint must do more than allege
the plaintiff's entitlement to relief.   A complaint has to
"show" such an entitlement with its facts.   <u>See</u> <u>Phillips</u>,
515 F.3d at 234-35.   As the Supreme Court instructed in
<u>Iqbal</u>, "[w]here the well-pleaded facts do not permit the
court to infer more than the mere possibility of
misconduct, the complaint has alleged – but it has not
'show[n]' – 'that the pleader is entitled to relief.'"
<u>Iqbal</u>, 129 S.Ct. at 1949...."

\*   \*   \*

578 F.3d at 210-11.

In sum, "Rule 8 marks a notable and generous departure from

the hyper-technical, code-pleading regime from a prior era, but

it does not unlock the doors of discovery for a plaintiff armed

with nothing more than conclusions." <u>Iqbal</u>, 129 S.Ct. at 1950.

## APPLICABLE LAW

Professionals have a duty to perform their services with

the "skill and knowledge normally possessed by members of that

profession or trade in good standing in similar communities."

<u>Restatement (Second) of Torts</u> § 299A.   To establish a claim of

professional malpractice under Pennsylvania law, which the

parties agree applies in this case, a plaintiff must establish

that (1) the defendant owed a duty to the plaintiff; (2) the

defendant breached that duty; (3) the plaintiff was actually

harmed; and (4) the defendant's breach caused that harm.   <u>In re:</u>

<u>Citx Corp., Inc.</u>, 448 F.3d 672, 677 (3d Cir.2006), *citing* <u>Martin</u>

<u>v. Evans</u>, 711 A.2d 458, 461 (Pa.1998).

6

With regard to the level of assurance provided by the
different types of accounting services, in <u>Otto v. Pennsylvania
State Education Ass'n - NEA</u>, 330 F.3d 125 (3d Cir.2003), the
Court of Appeals for the Third Circuit stated:

*   *   *

... Broadly speaking, auditors can provide three different
types of accounting services: compilations, reviews, and
audits.  A compilation is the "lowest level of assurance"
regarding an entity's financial statements.   Christian
Tregillis, <u>Overview of Services Provided by CPAs, in Basics
of Accounting & Finance: What Every Practicing Lawyer Needs
to Know</u>, 88 (PLI Corp. Law & Practice Course, Handbook
Series No. B-1064, 1998).  It expresses "neither an opinion
nor any level of assurance."  <u>Id</u>.  When performing a
compilation, an accountant need not "verify or corroborate
the financial statement information provided by the
client."  Jane Dillard-Eggers, <u>Understanding Compilations,
Reviews, and Audits</u>, at http://www.tscpa.com/public
/smallbusinessarticles/understanding  compilations.htm.

A review involves an intermediate level of scrutiny in
which the auditor provides "limited assurance" on the
entity's financial statements.  <u>See id</u>.  In so doing, the
auditor indicates that he "is not aware of any material
modifications needed to be in conformity with [generally
accepted accounting principles, also known as GAAP.]"
<u>Tregillis</u>, <u>supra</u>, at 88.  In order to provide this "limited
assurance," the auditor must make some, but not
comprehensive, inquiry into client management, accounting
practices, internal control structure, and analytical
procedures used by the organization.  <u>See Dillard-Eggers</u>,
<u>supra</u>.  The scope of the "inquiry and analytical procedures
are the major difference between a review and a
compilation."  Larry P. Bailey, <u>GAAS Guide: A Comprehensive
Restatement of Generally Accepted Auditing Standards</u> 16.31
(1994).

In an audit, which provides "the highest level of
assurance on financial statements," the accountant
"provides <u>verification</u> of the financial statements' claims

7

and assertions" and expresses an opinion on the entity's
financials. <u>Tregillis</u>, <u>supra</u>, at 85 (emphasis added).
Among other procedures, the accountant "consider[s] and
evaluate[s] ... the internal control system of the [client]
... [and] tests ... the underlying documentation to support
account balances." <u>Dillard-Eggers</u>, <u>supra</u>; <u>Bailey</u>, <u>supra</u>,
at 16.51....

                          *    *    *

330 F.3d at 133.

The specific scope of an accountant's duty to a client is
determined primarily by the terms and conditions of the contract
of employment. <u>Robert Wooler Co. v. The Fidelity Bank</u>, 479 A.2d
1027, 1031 (Pa.Super.1984), *citing* <u>O'Neill v. Atlas Automobile
Finance Corp.</u>, 11 A.2d 782, 786 (Pa.Super.1940).   In the present
case, the engagement letter prepared by the Dernar Defendants on
December 9, 2008 which was signed by Bancroft's Vice President
on December 15, 2008, states in relevant part:[3]

                          *    *    *

> This letter is to confirm our understanding of the terms
> and objectives of our engagement and the nature and
> limitations of the services we will provide.
>
> <u>Financial Statements</u>
>
> We will compile, from information you provide, the annual
> and quarter-end balance sheet of Bancroft Life and
> Casualty, LTD, as of December 31, 2008, and the related
> statement of income and retained earnings for the year
> 2008.  We will not perform an audit or review of such

---

[3] Although the Dernar Defendants' engagement letter dated December 9, 2008 was
not attached as an exhibit to Bancroft's complaint, a court may consider "an
undisputedly authentic document that a defendant attaches as an exhibit to a
motion to dismiss if the plaintiff's claims are based on the document."  <u>See
Pension Benefit Guar. Corp. v. White Consol. Indus.</u>, 998 F.2d 1192, 1196 (3d
Cir.1993).

financial statements.  Our report on the financial
statements of [Bancroft Life and Casualty, LTD], is
presently expected to read as follows:

> We have compiled the accompanying balance sheet of
> Bancroft Life and Casualty, LTD, as of December 31,
> 2008 and the related statement of income and retained
> earnings for the period then ended in accordance with
> Statements on Standards for Accounting and Review
> Services issued by the American Institute of Certified
> Public Accountants.
>
> A compilation is limited to presenting in the form of
> financial statements information that is the
> representation of management.  We have not audited or
> reviewed the accompanying financial statements and,
> accordingly, do not express an opinion or any other
> form of assurance on them.
>
> Management has elected to omit substantially all of
> the disclosures and the statement of cash flows
> required by generally accepted accounting principles.
> If the omitted disclosures and statement of cash flows
> were included in the financial statements, they might
> influence the user's conclusions about the Company's
> financial position and results of operations.
> Accordingly, these financial statements are not
> designed for those who are not informed about such
> matters.

                         *    *    *

Conclusion

You are responsible for management decisions and functions,
and for designating an individual with suitable skill,
knowledge, or experience to oversee any bookkeeping
services, tax services, or other services we provide.  You
are responsible for evaluating the adequacy of the results
of the services performed and accepting responsibility for
such services.  You are responsible for establishing and
maintaining internal controls, including monitoring ongoing
activities.

Our engagement cannot be relied upon to disclose errors,
fraud, or illegal acts that may exist.  However, we will
inform you of any material errors and any evidence or

information that comes to our attention during the performance of our compilation procedures, that fraud may have occurred.  In addition, we will report to you any evidence or information that comes to our attention during the performance of our compilation procedures regarding illegal acts that may have occurred, unless they are clearly inconsequential.  We have no responsibility to identify and communicate significant deficiencies or material weaknesses in your internal control as part of this engagement.[4]

\*     \*     \*

(Docket No. 222-1).

Although the scope of the engagement letter between Bancroft and the Dernar Defendants was limited to a compilation of financial statements and other documents which, as noted in Otto, supra, involves the lowest level of assurance, the Dernar Defendants could breach their professional duties to Bancroft if they encountered glaring irregularities or illegal activities in the information provided for the compilation, i.e., "red flags," and failed to disclose them to Bancroft.  Wooler, at 1032; In re: Citx Corp., Inc., Nos. 03-727, 03-cv-6766, 2005 WL 1388963, at *6 (E.D.Pa., June 7, 2005); In re: Computer Personalities Systems, Inc., No. 01-14231 DWS, ADV. 03-0220, 2003 WL 22844863, at *5 (Bkrtcy.E.D.Pa, Nov. 18, 2003).

---

[4] The Dernar Defendants attached an identical engagement letter dated April 6, 2010, for accounting services to be performed for ICMC.  The services involved compilations of the semi-annual and year-end balance sheets of two of Bancroft's ICs as of December 31, 2010 and the related statements of income and retained earnings of these ICs for the year 2010.  (Docket No. 222-2).

DISCUSSION

After consideration, the Court agrees with the Dernar Defendants that Bancroft's allegations against them do not meet the standard for pleading a plausible claim for relief enunciated in Twombly and elaborated upon in Iqbal.  The Dernar Defendants acknowledge that despite their limited engagement, i.e., to prepare compilations based on the information provided, they owed a duty to Bancroft to bring any "red flags" to its attention.  However, Bancroft fails to allege any "red flag" with specificity.  Instead, in opposition to the motion to dismiss, Bancroft argues that "the Amended Complaint *does* allege the specific 'red flag' – the knowing use of inaccurate, incomplete or otherwise unsatisfactory books and records, (sic) that resulted in inaccurate financial statements."  (Docket No. 225, p. 6).  Simply put, the foregoing allegation is nothing more than a "formulaic recitation" of the elements of Bancroft's professional malpractice claim against the Dernar Defendants. Twombly, 550 U.S. at 555.  The allegation does not permit the

Court to "infer more than the mere possibility of misconduct."[5]
Iqbal, 129 S.Ct. at 1950.

_Wiliam L Standish_
Judge William L. Standish
United States District Judge

Date: November 29, 2011

---

[5] The Court also notes that Bancroft's reliance on Lichtenstein v. Stockton
Bates, LLP, No. 01-14231DWS, ADV. 03-0220, 2003 WL 22844863 (Bkrtcy.E.D.Pa.,
Nov. 18, 2003), to oppose the Dernar Defendants' motion to dismiss is
misplaced.  (Docket No. 225, pp. 4-5).  Lichtenstein was decided 3½ years
before the Supreme Court's decision in Twombly.