IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BANCROFT LIFE & CASUALTY ICC, )
   LTD., )
                                   )
         Plaintiff, )
                                   )
        v. )   Civil Action No. 10-704
                                   )
INTERCONTINENTAL MANAGEMENT, )
   LTD., d/b/a INTERCONTINENTAL )
   CAPTIVE MANAGEMENT COMPANY, )
   LTD., INTERCONTINENTAL )
   MANAGEMENT, LTD., THE ROBERTS )
   AND PATTON LAW FIRM, JOHN R. )
   PATTON, ESQUIRE, GEORGE THOMAS )
   ROBERTS, ESQUIRE, NIGEL BAILEY, )
   CUNNINGHAM HUGHAN & COMPANY, )
   INC., THOMAS HUGHAN, C.P.A., )
   DERNAR & ASSOCIATES, LLC and )
   DAVID K. DERNAR, C.P.A., )
                                     )
        Defendants. )

**MEMORANDUM**

**I**

Before the Court is the motion of Defendants

Intercontinental Management, Ltd., d/b/a Intercontinental Captive

Management Company, Ltd. ("ICMC"), Intercontinental Management

Ltd. ("IML"), The Roberts and Patton Law Firm ("The R&P Law

Firm"), John R. Patton, Esquire ("Patton"), George Thomas

Roberts, Esquire ("Roberts") and Nigel Bailey ("Bailey")

(collectively, "ICMC Defendants") for leave to amend pleadings,

add new parties and join related litigation ("motion to amend

1

counterclaim and add new parties") (Docket No. 127);[1] the renewed
motion of Plaintiff, Bancroft Life & Casualty ICC, Ltd.
("Bancroft"), for sanctions pursuant to 28 U.S.C. § 1927 (Docket
No. 188); and the renewed motion of Bancroft to strike the ICMC
Defendants' motion to amend counterclaim and add new parties and
proposed third-party complaint (Docket No. 191).  For the reasons
set forth below, the ICMC Defendants' motion to amend
counterclaim and add new parties will be denied; Bancroft's
renewed motion for sanctions will be denied; and Bancroft's
renewed motion to strike will be granted.

## II

The background and protracted procedural history of this
litigation may be summarized as follows:[2]

Bancroft is an international insurance company that was
formed in the British Virgin Islands ("BVI") in 2003.  Bancroft
offers customized, tax-advantaged lines of insurance to United
States companies that generally are not available in the United
States.  Roberts, an attorney, was the president of ICMC, a
corporation created in 2000 in St. Thomas, United States Virgin
Islands for the purpose of providing management services to

---

1As noted *infra*, the request of the ICMC Defendants in the present motion
to join related litigation with this case was denied in an Order filed July
15, 2011.  (Docket No. 163, p. 2).  Thus, this aspect of the motion will not
be discussed herein.

2

international insurance companies. Patton, also an attorney and Roberts' law partner, Bailey and Stewart Schwab ("Schwab") were vice presidents of ICMC.

Upon its formation, Bancroft retained The R&P Law Firm to serve as its general counsel based on the alleged expertise of Roberts and Patton in international insurance and tax law. On October 15, 2004, Bancroft entered into a management agreement with ICMC based on Roberts' recommendation. In the management agreement, which was drafted by Roberts, ICMC agreed, among other things, to (a) maintain complete records of Bancroft's insurance transactions; (b) prepare all policies of insurance issued by Bancroft; (c) prepare and mail premium notices and arrange for the collection of premiums; (d) evaluate, accept, reject, adjust or settle insurance claims on Bancroft's behalf; (e) maintain complete books, records and accounts of Bancroft; (f) maintain and operate Bancroft in compliance with the laws of its domicile jurisdiction, including the preparation and filing of all required reports; and (g) prepare Bancroft's financial statements and tax returns.[3]

---

2 The background of this case is derived from the evidence offered during a lengthy hearing on Bancroft's motion for preliminary injunctive relief against the ICMC Defendants.

3 ICMC subcontracted the preparation of Bancroft's tax returns to Defendants Cunningham Hughan & Company, Inc. and Thomas Hughan, C.P.A. (collectively, "Hughan Defendants"). (Docket No. 82, p. 40).

3

In 2006, Bancroft relocated to the Caribbean island of St. Lucia.[4] During that year, the International Insurance Act of St. Lucia was amended to permit international insurance companies to offer a new line of business that is based on one entity, the incorporated cell company ("ICC"), being licensed to provide insurance through a separate company which is called an incorporated cell ("IC"). In late 2007, Bancroft decided to offer insurance to United States companies that elected not to participate in its group plan utilizing the ICC/IC model. As a result, ICMC's management responsibilities were expanded to include the formation and management of Bancroft's ICs. In 2008 and 2009, ICMC and The R&P Law Firm formed 10 ICs for Bancroft.

Due to dissatisfaction with ICMC's management services, Bancroft gave written notice to ICMC of its termination of the management agreement in early October 2009. Claiming that it did not receive the termination notice, ICMC gave Bancroft written notice of its termination of the management agreement two months later. ICMC ceased business operations in January 2010. Approximately a month later, ICMC's assets were transferred to IML, a Pennsylvania corporation organized by ICMC's former principals, Roberts, Patton, Bailey and Schwab. IML provides the

_____

4 During the hearing on Bancroft's motion for a preliminary injunction, Roberts testified that he recommended Bancroft's relocation due to his

same services previously provided by ICMC; IML operates out of ICMC's former location; and IML's clients are ICMC's former clients.

Bancroft filed this civil action on May 21, 2010, arising out of (a) the services provided by ICMC and its subcontractors for Bancroft and its ICs pursuant to the management agreement, (b) certain actions taken by ICMC's principals with respect to Bancroft and its ICs while the management agreement was in effect and after its termination, and (c) Roberts' alleged breach of an oral compensation agreement. In its original complaint, Bancroft asserted claims for **breach of fiduciary duty** (against The R&P Law Firm, Roberts and Patton (Count I) and against ICMC (Count II)); **fraud** (against ICMC, Roberts and Bailey (Count III)); **conversion** (against ICMC (Count IV)); **accounting malpractice** (against the Hughan Defendants (Count V)); **legal malpractice** (against The R&P Law Firm, Roberts and Patton (Count VI)); **defamation** (against ICMC, IML and Roberts (Count VII)); **breach of contract** (against Roberts (Count VIII) and against ICMC (Count IX)); **tortious interference with existing contractual relationships** (against ICMC, IML, Roberts, Patton and Bailey (Count X)); and **tortious interference with prospective economic advantage** (against ICMC,

familiarity with the "regulatory environment of St. Lucia." (Docket No. 82,

5

IML, Roberts, Patton and Bailey (Count XI)). (Docket No. 1-2, pp. 2-53).

On June 11, 2010, Bancroft moved for a preliminary injunction against the ICMC Defendants seeking an Order (a) compelling them to turn over all of Bancroft's records in their possession and (b) restraining them from interfering with Bancroft's contractual and business relationships with its ICs. At the same time, Bancroft moved for an Order freezing the ICMC Defendants' assets prior to judgment. (Docket Nos. 11, 13). Two weeks later, Bancroft moved for a temporary restraining order ("TRO") against the ICMC Defendants. (Docket No. 19). Prior to the scheduled hearing on the motion, however, the ICMC Defendants consented to a TRO which was signed by the Court on July 7, 2010. (Docket Nos. 37-38).

In their answer to the complaint, which was filed on July 13, 2010, the ICMC Defendants asserted a counterclaim against Bancroft for breach of the management agreement, seeking damages in the amount of $148,344.98.[5] In addition, the ICMC Defendants sought indemnification from Bancroft pursuant to a provision in the management agreement "to the extent that any one of These

---

p. 33).

Defendants come within the scope of said indemnification

requirement, for the payment of all costs, fees and damages

required to be paid by Bancroft pursuant to the indemnification

obligation."[6]  Finally, "to the extent that Bancroft's conduct

has caused or continues to cause harm" to the ICMC Defendants,

they asserted a "claim ... for any and all damages suffered as a

result of said conduct." (Docket No. 41, ¶¶ 283-292).  On August

3, 2010, Bancroft moved to dismiss the ICMC Defendants'

counterclaim in its entirety. (Docket No. 52).

A hearing on Bancroft's motions for a preliminary injunction

and prejudgment asset freeze was held on August 4, August 5,

August 18, August 19, August 31, and September 2, 2010 (Docket

Nos. 78-83), and the parties' post-hearing submissions were filed

---

5 On July 28, 2010, the Hughan Defendants filed a separate answer to
Bancroft's complaint in which no counterclaims were asserted. (Docket No.
48).

6 The indemnification provision in the management agreement states:

[Bancroft] will indemnify, defend and hold harmless INTERCONTINENTAL,
its directors, officers, shareholders, agents and employees and each of
them against any liability, actions, proceedings, claims, demands, costs
or expenses whatsoever, including but not limited to exemplary or
punitive damages which they or any of them may incur or be subject to in
consequence of this Agreement or result from the performance of
[Bancroft] in carrying out the functions and services provided for
hereunder, except as such costs and liabilities are the result of the
negligent acts or omissions, dishonesty or willful default of
INTERCONTINENTAL or any of its directors, officers, shareholders,
employees and agents, as the case may be.  This indemnity shall
expressly inure to the benefit of any director, shareholder, agent,
officer, or employee of INTERCONTINENTAL existing or future, and to the
benefit of any successor owner hereunder.

(Docket No. 1-2, p. 60, ¶ 11).

on October 1, 2010. (Docket Nos. 75-77). On December 21, 2010, the Court filed an Opinion and Order granting Bancroft's motion for a preliminary injunction. The ICMC Defendants were directed to immediately return any property belonging to Bancroft that remained in their physical or constructive possession and to cease interfering in Bancroft's efforts to maintain and manage its licensed ICs.[7] (Docket Nos. 93-94). By Order dated February 22, 2011, the Court denied Bancroft's motion for a prejudgment asset freeze against the ICMC Defendants. (Docket No. 114).

On February 24, 2011, the Court filed a Memorandum Opinion and Order granting Bancroft's motion to dismiss the ICMC Defendants' counterclaim in its entirety. First, because ICMC was the only counterclaimant to allege a contract with Bancroft, a breach of that contract and resulting damages, the Court agreed with Bancroft that IML, The R&P Law Firm, Roberts, Patton and Bailey failed to state a breach of contract claim. Second, the Court agreed with Bancroft that none of the ICMC Defendants adequately pled a claim for indemnification. Specifically, the ICMC Defendants failed to allege that they suffered a loss within the scope of the indemnification provision in the management agreement. Thus, the indemnification claim was dismissed without

---

7 The Court's Opinion and Order granting Bancroft's motion for a preliminary injunction against the ICMC Defendants was affirmed by the Court

prejudice. Third, the Court agreed with Bancroft that the "catch-all" counterclaim failed to state a claim upon which relief may be granted because it failed to identify any cognizable legal theory or conduct by Bancroft that caused harm to any of the ICMC Defendants. (Docket No. 115).

On May 24, 2011, Bancroft filed a motion for leave to amend its complaint to add Defendants Dernar & Associates, LLC and David K. Dernar, C.P.A ("Dernar Defendants"), another accounting firm and accountant retained by ICMC to perform services for Bancroft and its ICs under the management agreement.[8] (Docket No. 125). The next day, the ICMC Defendants filed the present motion seeking to amend ICMC's counterclaim against Bancroft to re-assert an indemnification claim by all of the ICMC Defendants and to file a third-party complaint against 7 individuals and 3 entities, all of whom are affiliated in some way with Bancroft or its principals. (Docket No. 127). Bancroft was ordered to file a response by June 10, 2011. Rather than filing a straightforward response as directed by the Court, however, Bancroft filed a motion to strike the motion to amend

---

of Appeals for the Third Circuit on January 5, 2012. (Docket No. 273).
    8 In the proposed amended complaint, Bancroft alleged that the Dernar Defendants were retained by ICMC "to prepare, among other things, financial statements and semi-annual reports for Bancroft and Bancroft's ICs for submission to the St. Lucia Ministry of Finance, and the tax returns for Bancroft's ICs." (Docket No. 169, ¶ 189).

counterclaim and add new parties, to seal and for sanctions on June 3, 2011. (Docket No. 130).

On June 7, 2011, the Court filed an Order which (a) directed all Defendants to file responses to Bancroft's motion to amend its complaint to add the Dernar Defendants; (b) directed that Bancroft's motion to strike the ICMC Defendants' motion to amend counterclaim and add new parties, to seal and for sanctions be stricken; (c) directed Bancroft to file a response to the ICMC Defendants' motion to amend counterclaim and add new parties by June 13, 2011; (d) scheduled a hearing for July 7, 2011 (which was subsequently continued to July 14, 2011); and (e) provided that no additional pleadings were to be filed before June 30, 2011 "without prior leave of Court for good cause shown." (Docket No. 135).

On June 9, 2011, Bancroft filed a brief in opposition to the ICMC Defendants' motion to amend counterclaim and add new parties. (Docket No. 136). On June 10, 2011, in contravention of the Court's June 7, 2011 Order, Bancroft filed another motion to strike the ICMC Defendants' motion to amend counterclaim and add new parties. (Docket No. 137). Three days later and again in contravention of the Court's June 7, 2011 Order, Bancroft filed a motion for sanctions against the ICMC Defendants. (Docket No. 142).

Following the hearing on July 14, 2011, the Court entered an Order (a) granting Bancroft's motion for leave to file an amended complaint to add the Dernar Defendants; (b) denying the aspect of the present motion in which the ICMC Defendants sought to join this case with other litigation involving Bancroft in this Court, the Northern District of Georgia, the Southern District of Texas, the District of Nevada, the Central District of California, the Western District of Washington and the Southern District of New York (Docket No. 127, pp. 11-13); (c) deferring a ruling on the ICMC Defendants' motion to amend counterclaim and add new parties; (d) directing the ICMC Defendants to file the proposed amended counterclaim against Bancroft and the proposed third-party complaint by July 29, 2011; (e) denying Bancroft's motion to strike and motion for sanctions without prejudice to Bancroft's right to renew the motions following the filing of the proposed amended counterclaim and proposed third-party complaint by the ICMC Defendants; and (f) granting Bancroft's motion to extend the time for discovery to November 25, 2011. (Docket Nos. 163, 164).

On July 29, 2011, the ICMC Defendants filed the proposed amended counterclaim against Bancroft and the proposed third-party complaint. (Docket Nos. 175-176). As to the proposed amended counterclaim, it is alleged, in summary, that all of the

ICMC Defendants fall within the indemnification provision in the management agreement;[9] that Bancroft owed a duty under the management agreement, as well as common law, to provide complete and accurate financial information to ICMC for the preparation of financial statements and tax returns;[10] that Bancroft had an implied duty not to engage in fraudulent activity; that Bancroft breached the foregoing duties; and that, as a result, the ICMC Defendants have sustained damages in excess of $1,000,000, including counsel fees, costs and loss of business. (Docket No. 175, ¶¶ 1-12).

With respect to the proposed third-party complaint, the ICMC Defendants allege that in the event ICMC is held liable on Bancroft's claims, they are entitled to indemnification from the following individuals and entities: Philip Sigel ("P. Sigel") (Count I), Bradley Barros ("Barros")(Count II), Stu Anolik ("Anolik")(Count III), Nicholas John, Esquire ("John")(Count IV), Andrew Watson ("Watson")(Count V), Loren Cook, Esquire/C.P.A. ("Cook")(Count VI), Gail Sigel ("G. Sigel")(Count VII),

---

9 See Footnote 6.
10 With regard to this duty, the ICMC Defendants note that the management agreement contained the following provision:

    ... [Bancroft] will use its best efforts at all times to supply
INTERCONTINENTAL with such information and instructions as are
necessary for maintenance of such records and accounts; provided always
that while INTERCONTINENTAL shall use its best endeavors,
INTERCONTINENTAL shall not be liable in the event that information is
not forthcoming and made available to INTERCONTINENTAL.

Associated Benefits Group ("ABG")(Count IX) and Global Financial Advisor Network ("GFAN")(Count X). In addition, in Count VIII of the proposed third-party complaint, Roberts asserts a claim against The Bancroft Trust, seeking an accounting and payment of all amounts allegedly due him as a trust beneficiary. (Docket No. 176).

On August 3, 2011, Bancroft moved for leave to file a supplemental brief in opposition to the ICMC Defendants' motion to add new parties which was granted the next day. (Docket Nos. 178, 181). On August 10, 2011, Bancroft renewed its motion for sanctions, filed its supplemental brief in opposition, and renewed its motion to strike. (Docket Nos. 188, 190-191). The next day, the ICMC Defendants moved for leave to file responses to the foregoing documents. (Docket No. 193). The motion was granted (Docket No. 194), and the responses were filed on August 25, 2011. (Docket Nos. 200-201).

On August 30, 2011, Bancroft moved for leave to file a further brief in opposition to the ICMC Defendants' motion to add new parties for the limited purpose of clarifying the deposition testimony of Jerome M. Hesch, Esquire, which had been discussed in the ICMC Defendants' response in opposition to Bancroft's renewed motion to strike the motion to amend counterclaim and add

_____

(Docket 1-2, p. 57, ¶ 2k).

new parties.[11] (Docket No. 202). The motion was granted and the supplemental brief filed on September 2, 2011. (Docket Nos. 203, 206). On the same day, the ICMC Defendants moved for leave to file a supplemental response regarding the testimony of Attorney Hesch. (Docket No. 205). The motion was granted and the supplemental response was filed on September 9, 2011. (Docket Nos. 208, 217).

On September 9, 2011, the Dernar Defendants filed a motion to dismiss the accounting malpractice claim asserted against them in Bancroft's amended complaint, as well as a motion to dismiss the crossclaim asserted against them by the Hughan Defendants. (Docket Nos. 213, 215). Thereafter, briefs in opposition and reply briefs were filed. (Docket Nos. 224-225, 227-228). On November 29, 2011, the Court filed a Memorandum Opinion and Order granting (without prejudice to Bancroft's right to file a second amended complaint) the motion of the Dernar Defendants to dismiss the claim asserted against them in Bancroft's amended complaint for failure to state a plausible claim. (Docket Nos. 248-249). Also by Order filed November 29, 2011, the motion of the Dernar Defendants to dismiss the crossclaim asserted against them by the

---

11Attorney Hesch practices in the following areas of law: general business, tax, estate planning, mergers and acquisitions, corporate finance, financial derivatives and energy tax credits. He also is an adjunct professor at the University of Miami School of Law, the St. Thomas University School of Law and the Florida International School of Law. Attorney Hesch served as

Hughan Defendants was granted without prejudice to the right of the Hughan Defendants to amend the crossclaim. (Docket No. 250). On December 9, 2011, Bancroft filed a second amended complaint.[12] (Docket No. 258).

On January 3, 2012, the Dernar Defendants and the Hughan Defendants filed motions to dismiss the claims asserted against them in Bancroft's second amended complaint with supporting briefs. (Docket Nos. 266-269). Bancroft filed briefs in opposition to the motions to dismiss on January 27, 2012, and the Dernar Defendants filed a reply brief on February 8, 2012. (Docket Nos. 276-277, 284). The motions to dismiss are presently pending.

### III

### Motion to Amend Counterclaim Against Bancroft

As noted in the Court's summary of the background of this case, one of the breaches of the management agreement alleged by Bancroft was ICMC's failure to provide accurate financial statements and tax returns for Bancroft and its ICs. The ICMC Defendants seek leave to amend ICMC's counterclaim against Bancroft to add claims for common law and contractual

---

Bancroft's tax attorney at one time. He is the individual who referred Bancroft to Roberts and ICMC. (Docket No. 217, p. 3).

12 The Court also notes that between June 1, 2011 and December 13, 2011, Bancroft filed, and the Court ruled on, 10 separate discovery motions. (Docket Nos. 128, 157, 161, 163, 196, 229-233, 251, 253-254, 260).

indemnification by all of the ICMC Defendants. Specifically, in
the event it is determined that ICMC is liable for preparing
inaccurate financial statements and tax returns for Bancroft and
its ICs, the ICMC Defendants claim entitlement to indemnification
because the information utilized to prepare the financial
statements and tax returns was provided to ICMC by Bancroft and
its principals and agents. Because any amendment of ICMC's
counterclaim to include a claim for common law or contractual
indemnification by all of the ICMC Defendants would be futile,
the motion to amend will be denied. See Foman v. Davis, 371 U.S.
178, 182 (1962).

## Common Law Indemnification

In Builders Supply Co. v. McCabe, 366 Pa. 322, 77 A.2d 368
(1951), the leading case in Pennsylvania on common law indemnity,
the Pennsylvania Supreme Court noted:

\*   \*   \*

... The right of *indemnity* rests upon the difference
between the primary and the secondary liability of two
persons each of whom is made responsible by the law to an
injured party. It is a right that enures to a person who,
without active fault on his own part, has been compelled, by
reason of some legal obligation, to pay damages occasioned
by the initial negligence of another, and for which he
himself is only secondarily liable. The difference between
primary and secondary liability is not based on a difference
in *degrees* of negligence ... It depends on a difference in
the *character* or *kind* of the wrongs which cause the injury
and in the nature of the legal obligation owed by each of
the wrongdoers to the injured person. Secondary liability
exists, for example, where there is a relation of employer

16

and employee, or principal and agent; if a tort is committed by the employee or the agent recovery may be had against the employer or the principal on the theory of respondeat superior, but the person primarily liable is the employee or agent who committed the tort, and the employer or principal may recover indemnity from him for the damages he has been obliged to pay....

\* \* \*

366 Pa. at 325-26, 77 A.2d at 370.

Since there is no basis for primary and secondary liability with regard to any of the tort claims asserted by Bancroft against the ICMC Defendants, common law indemnification has no applicability in the present case. Moreover, as noted by Bancroft, with the exception of breach of contract and legal malpractice claims, all of its claims in this case are intentional torts and indemnity is unavailable to an intentional tortfeasor because it would permit him to escape liability for his own deliberate acts.[13] (Docket No. 136, pp. 7-8). See Canavin v. Naik, 648 F.Supp. 268, 269 (E.D.Pa.1986); Harmelin v. Man Financial, Inc., Civil Action No. 06-1944, 2007 WL 2932866, at *5 n.6 (Oct. 2, 2007), *citing*, Allegheny General Hosp. v. Philip Morris, Inc., 228 F.3d 429, 448 (3d Cir.2000)(Pennsylvania does not allow indemnification for intentional torts).

---

[13] As to the legal malpractice claim against The R&P Law Firm, Roberts and Patton, as noted by Bancroft, this claim "could not possibly have resulted from misconduct by Bancroft." Therefore, indemnification is inapplicable. (Docket No. 136, pp. 7-8, n.2).

## Contractual Indemnification

With regard to Bancroft's breach of contract claim against
ICMC, it is alleged, in summary, that ICMC breached the
management agreement in the following respects:

(a) by failing to maintain and provide complete records of
insurance and reinsurance transactions;

(b) by failing to maintain complete books, records and
accounts as required by law and generally accepted accounting
procedures for insurance companies;

(c) by failing to prepare timely and accurate financial
statements;

(d) by failing to file semi-annual reports of selected
financial information from Bancroft and its ICs as required by
the St. Lucia Ministry of Finance;

(e) by failing to prepare and file accurate and timely tax
returns;

(f) by failing to prepare timely and accurate "participant
reserve statements;"

(g) by failing to cooperate with Bancroft's St. Lucia
counsel in the creation and execution of corporate documents;

(h) by failing to accurately calculate the "refund rights"
of Bancroft's insureds;

(i) by failing to properly allocate investment gains to
Bancroft's insureds;

(j) by failing to perform actuarial services for which
Bancroft was billed by ICMC and promptly paid;

(k) by failing to properly oversee the actions and corporate
acts of Bancroft's ICs;

(l) by failing to record security documents for commercial
loans made by Bancroft to its insureds;

(m) by failing to provide adequate and competent staff to perform its obligations under the management agreement;

(n) by failing to cooperate with Bancroft's auditors;

(o) by failing to return all of the books, records and statistics produced for Bancroft;

(p) by failing to accurately record loans made by Bancroft to its insureds; and

(q) by failing to indemnify, defend and hold Bancroft harmless against any liability, actions, proceedings, claims, demands, costs or expenses it has incurred as a consequence of ICMC's performance of, or failure to perform, the contract.[14]

(Docket No. 262, pp. 50-51, ¶¶ 241-245).

As noted previously, the basis for the proposed amendment of the counterclaim to include a contractual indemnification claim by all of the ICMC Defendants under the management agreement is Bancroft's alleged failure to provide ICMC with accurate information to prepare the financial statements and tax returns it was obligated to prepare for Bancroft and its ICs. While this allegation is a defense to some of the breaches alleged by Bancroft (see (c), (e), (f), (h), (p)), it is not a basis for a contractual indemnification claim against Bancroft in the event ICMC is found liable for those alleged breaches. Moreover, this allegation has no applicability to the remaining breaches alleged by Bancroft which are unrelated to the accuracy of the financial statements and tax returns prepared by ICMC.

Turning to the breach of contract claim asserted against Roberts, this claim relates to Roberts' alleged breach of an oral agreement with Bancroft to devote his full time and attention to the management of Bancroft in exchange for a monthly payment of $20,000 from The Bancroft Trust. (Docket No. 262, p. 49, ¶¶ 234-39). Simply put, the Court agrees with Bancroft there could be no plausible claim that Roberts is entitled to indemnification from Bancroft under the management agreement in the event he is found liable for breaching the alleged compensation agreement. (Docket No. 136, p. 7).

## IV

## Motion to Add New Parties

The ICMC Defendants seek leave of Court (a) to assert third-party claims for indemnification against P. Sigel, Barros, John, Watson, Cook, G. Sigel, ABG and GFAN and (b) for Roberts to assert a claim against The Bancroft Trust for an accounting and payment of amounts allegedly due him as a trust beneficiary. The allegations in the proposed third-party complaint may be summarized as follows:

> **Count I** - **P. Sigel** is a principal of Bancroft and Trustee of The Bancroft Trust which owns Bancroft. In 2002, P. Sigel diverted to Bancroft's bank accounts $2.7 million in premium payments by 11 participants in ABG, a trade association, that were intended for an insurance program offered by

---

14 ICMC's indemnification obligation to Bancroft was set forth in Section 10 of the management agreement. (Docket No. 1-2, p. 60).

Boston Life and Annuity called Refund Plus. P. Sigel also sold an investment in American Residential Equities ("ARE") to Bancroft for at least $20 million while Bancroft was still domiciled in the BVI. To avoid the risk of Bancroft being deemed insolvent for regulatory purposes in the BVI, P. Sigel directed that the ARE investment be characterized on Bancroft's financial statements as a loan. In 2008, P. Sigel used the economic downturn as an opportunity to deduct $6 million from the accounts of Bancroft's insureds under the "guise of reserves against unrealized contingencies" to protect Bancroft's investments, despite the fact that Bancroft had suffered no losses at the time. When ICMC terminated the management agreement, none of this money had been credited back to the insureds' accounts. The ICMC Defendants maintain that any financial distress experienced by Bancroft was the result of the foregoing actions of P. Sigel, not any breach of the management agreement by ICMC. Thus, in the event they are held liable to Bancroft, the ICMC Defendants claim entitlement to indemnification from P. Sigel. (Docket No. 176, pp. 9-10).

**Count II** - **Barros** is a principal of Bancroft. Barros ran the operations at ICMC serving as the "de facto manager" of ICMC's employees. Barros, directly and through others not employed by ICMC, supplied "practically all" the data for ICMC's bookkeeping and other recordkeeping functions for Bancroft, including information relating to new business, loans and claims. ICMC "served as nothing more than a data entry clerk in creating records that were wholly dependent on Barros and those under his control for accuracy." To the extent ICMC may ever be held liable for any accounting inaccuracies in Bancroft's financial statements or quarterly reports or for administration of Bancroft's loans and claims, the ICMC Defendants claim entitlement to indemnification from Barros. (Docket No. 176, pp. 11-12).

**Count III** - In this count, the ICMC Defendants asserted a claim against **Anolik**, a Bancroft director, arising out of transactions involving a Bancroft insured identified as "JKT." (Docket No. 176, p. 13). However, based on Bancroft's representations in the brief filed in opposition to the motion to add new parties concerning the scope of its claims in this case (Docket No. 136, p. 13), the ICMC Defendants agreed to delete the indemnification claim against Anolik in the proposed third-party complaint. (Docket No. 152, p. 6).

**Count IV - John** is a director of Bancroft and an attorney licensed to practice law in St. Lucia. He served as local agent for Bancroft's ICs. John was responsible for filing the documents necessary for Roberts to be approved by St. Lucia authorities as a director of Bancroft, but failed to do so. John's tortious action or inactions led Roberts to believe that he was properly holding himself out as a director of Bancroft when he was not.[15] To the extent ICMC or any of the ICMC Defendants may be held liable for any misdeed by Bancroft, the ICMC Defendants claim entitlement to indemnification from John. (Docket No. 176, pp. 13-14).

**Count V - Watson** is, or was, the accountant for Barros, ABG and GFAN. He also served as Bancroft's accountant for most of the time the management agreement with ICMC was in place. Barros demanded that Watson be part of the team directing ICMC's employees. Watson communicated directly with ICMC staff on a regular basis, reviewed ICMC's data entry operations and prepared most of the original spreadsheets from which ICMC input data received from Barros, ABG, GFAN and G. Sigel. To the extent ICMC may ever be held liable for inaccuracies in Bancroft's financial statements or quarterly reports or for administration of Bancroft's claims or loans, the ICMC Defendants claim entitlement to indemnification from Watson. (Docket No. 176, p. 15).

**Count VI - Cook** is a certified public accountant and an attorney licensed to practice law in the State of Texas. Cook maintained multiple bank accounts in Houston, Texas for

---

[15] At the time of Bancroft's decision to offer insurance utilizing the ICC/IC model, Roberts informed P. Sigel that it would be necessary for him to become a director of Bancroft's ICs in order for ICMC to manage them. To become a director of Bancroft's ICs, however, Roberts first had to become a director of Bancroft. The allegations against John in the proposed third-party complaint relate to Roberts' installment of himself as a director of Bancroft's ICs, despite his failure to obtain approval from the St. Lucia Regulator to serve as a director of Bancroft. In this regard, based on the evidence presented during the preliminary injunction hearing, the Court found Roberts' claim that he had been approved as a director of Bancroft in early 2008 to be "totally lacking in credibility." In addition, the Court found that in May 2009, Bancroft received a financial report that had been prepared by ICMC and signed by Roberts as a purported director of Bancroft. Upon receipt, John promptly brought to Roberts' attention the fact that he was not a Bancroft director, and John requested an unsigned copy of the financial report to be submitted to the St. Lucia Regulator with the signature of an actual Bancroft director. Roberts complied with John's request. (Docket No. 93, pp. 24-25, ¶¶ 41-42).

the transaction of Bancroft/ABG business. Cook negotiated
loan terms and prepared loan documents on Bancroft's behalf.
Cook did not supply documents relating to Bancroft loans to
ICMC until 2007. Cook actively and personally participated
in supplying financial and other information concerning his
handling of Bancroft funds to ICMC, either directly or
through ABG or GFAN. To the extent ICMC may ever be held
liable for accounting inaccuracies in Bancroft's financial
statements or quarterly reports or for administration of
Bancroft's claims or loans, the ICMC Defendants claim
entitlement to indemnification from Cook. (Docket No. 176,
pp. 16-17).

**Count VII - G. Sigel** is the sister of P. Sigel. She was
retained by Bancroft, P. Sigel and Barros to provide
services relating to ICMC's management of Bancroft's
financial records and financial reporting requirements. G.
Sigel was in charge of all accounting functions for
Bancroft. G. Sigel directed ICMC to purchase an updated
version of Quickbooks software and created a new, revised
chart of accounts for Bancroft. G. Sigel entered the
opening balances in the updated Quickbooks software and
hired an accounting firm in Miami, Florida to assist her in
overseeing ICMC's accounting operations and daily data entry
for Bancroft. To the extent Bancroft's auditors had serious
concerns when initially preparing its 2008 audit, those
concerns were due solely to G. Sigel's entry of opening
balances in Quickbooks for 2008 that did not match the
closing balances for 2007. To the extent ICMC may ever be
held liable for accounting inaccuracies in Bancroft's
financial statements or quarterly reports or for
administration of Bancroft's claims and loans, the ICMC
Defendants claim entitlement to indemnification from G.
Sigel. (Docket No. 176, pp. 18-19).

**Count VIII - The Bancroft Trust** is the owner of Bancroft.
Bancroft alleges that Roberts was a beneficiary of The
Bancroft Trust until he failed to devote his full time and
attention to Bancroft as agreed. Roberts denies that
devotion of his full time and attention to Bancroft was a
condition of his beneficiary status. Rather, Roberts
alleges that he received an interest in The Bancroft Trust
as a replacement for his hourly billing to Bancroft.
Roberts claims that The Bancroft Trust has a duty to account
to him and to pay all amounts due him as a beneficiary
thereof. (Docket No. 176, pp. 19-20).

**Count IX - ABG**, a Florida corporation, is owned by, and an alter ego of, Barros. ABG maintained at least one bank account for the transaction of Bancroft business. ABG was the marketing agent for Boston Life and Annuity and was instrumental in the diversion to Bancroft of the $2.7 million in premium payments intended for the Refund Plus program offered by Boston Life and Annuity. ABG maintained all of Bancroft's original records and only provided copies of the records to ICMC. To the extent ICMC may ever be held liable for accounting inaccuracies in Bancroft's financial statements or quarterly reports or for administration of Bancroft's claims or loans, the ICMC Defendants claim entitlement to indemnification from ABG. (Docket No. 176, pp. 20-21).

**Count X - GFAN** is another alter ego of Barros that was instrumental in (a) the diversion to Bancroft of the $2.7 million in premium payments intended for the Refund Plus program offered by Boston Life and Annuity and (b) supplying information to ICMC for inclusion in Bancroft's records. To the extent ICMC may ever be held liable for accounting inaccuracies in Bancroft's financial statements or quarterly reports or for administration of Bancroft's claims or loans, the ICMC Defendants claim entitlement to indemnification from GFAN. (Docket No. 176, p. 22).

## Federal Rule of Civil Procedure 14

Under Rule 14(a)(1) of the Federal Rules of Civil Procedure, "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." A defendant may not use Rule 14 to implead a third-party defendant who may have liability to the plaintiff instead of the defendant or in addition to the defendant. Rather, a defendant may use Rule 14 to implead a third-party defendant only if that third party will be liable to the defendant if the defendant is found liable to

the plaintiff.  United States v. Bailey, 516 F.Supp.2d 998, 1020

D.Minn.), affirmed, 571 F.3d 791 (8th Cir.2007).  See also FDIC

v. Bathgate, 27 F.3d 850, 873 (3d Cir.1994)("A third party claim

may be asserted under Rule 14(a) only when the third party's

liability is in some way dependent on the outcome of the main

claim or when the third party is secondarily liable to

defendant.").  After consideration, the Court agrees with

Bancroft that the ICMC Defendants' motion to add new parties

should be denied on the ground of futility.

With respect to contractual indemnification, there is no

evidence of a contractual relationship between any of the ICMC

Defendants and any of the proposed third-party defendants.

Accordingly, any claim for contractual indemnification would fail

as a matter of law.  As to common law indemnification, there is

no claim in Bancroft's second amended complaint giving rise to

the possibility of primary and secondary liability between any of

the ICMC Defendants and any of the proposed third-party

defendants.  Further, as noted in connection with the denial of

the ICMC Defendants' motion to amend counterclaim, Bancroft's

tort claims in this case are for intentional torts, and common

law indemnity is not available to an intentional tortfeasor.

Thus, there is no basis for common law indemnification.

To the extent Bancroft's breach of contract claim against
ICMC is based on its failure to provide accurate financial
statements and tax returns for Bancroft and its ICs as required
by the management agreement, ICMC can defend against such claim
by arguing that the documents were prepared utilizing financial
information provided solely by Bancroft and the proposed third-
party defendants.   Indemnification by the third-party defendants,
however, is inapplicable.[16]   See Bailey, 516 F.Supp.2d at 1020.

Further, the Court notes its agreement with Bancroft that
the motion to add new parties should be denied because the
proposed third-party complaint seeks to inject matters having no
relation to Bancroft's claims in this case; it would unduly
complicate this already complex case; and, due to the need for
additional discovery if the proposed third-party complaint were
permitted, it would delay resolution of this case which was filed
almost 2 years ago.

**V**

### Bancroft's Renewed Motion to Strike

Rule 12(f) of the Federal Rules of Civil Procedure
authorizes the Court to "strike from a pleading ... any
redundant, immaterial, impertinent, or scandalous matter."

---

16 Regarding the proposed third-party claim by Roberts against The Bancroft
Trust for an accounting and payment of amounts allegedly due Roberts as a

"Immaterial" matter is that which has no essential or important relationship to the claim for relief. "Impertinent" matter consists of statements that do not pertain, and are not necessary, to the issues in question. A "scandalous" matter or pleading is one that casts a derogatory light on someone, uses repulsive language, or detracts from the dignity of the court. Conklin v. Anthou, Civ. No. 1:10-CV-02501, 2011 WL 1303299, *1 (M.D.Pa., Apr. 5, 2011)(internal citations omitted).[17]

As noted previously, in the motion to amend counterclaim and add new parties and in the proposed third-party complaint, the ICMC Defendants make allegations of fraud against Bancroft and its principals relating to (a) the diversion to Bancroft's accounts of more than $2.7 million in premium payments intended for a program of Boston Life and Annuity in 2002; (b) the re-characterization of a Bancroft investment as a loan due to issues arising in a 2004 audit of Bancroft in the BVI prior to Bancroft's relocation to St. Lucia and utilization of the ICC/IC model of business; (c) an unjustified deduction by Bancroft of approximately $6,000,000 from its policyholders' accounts "under the guise of reserves against unrealized contingencies;" and (d)

---

trust beneficiary, this also is not the type of claim that may be asserted in a third-party complaint under Rule 14(a).

17 "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." Tennis v. Ford Motor Co., 730 F.Supp.2d 437 (W.D.Pa.2010), quoting, McInerney v. Moyer Lumber & Hardware, Inc., 244 F.Supp.2d 393, 402 (W.D.Pa.2002).

a claim that Bancroft's program is nothing more than an illegal
tax shelter.

After consideration, the Court agrees with Bancroft that the
foregoing allegations are impertinent and cast a derogatory light
on Bancroft and its principals and should be stricken.[18]
Contrary to the position of the ICMC Defendants, the fraudulent
transactions alleged in the motion to amend counterclaim and add
new parties and in the proposed third-party complaint are not
related to Bancroft's claims in this case which pertain solely to
(a) ICMC's performance of the management agreement with Bancroft,
(b) ICMC's interference with Bancroft's attempts to manage its
ICs after termination of the management agreement, and (c)
Roberts' fulfillment of a condition of the oral compensation
agreement pursuant to which he was designated a beneficiary of
The Bancroft Trust. Significantly, 2 of the 3 alleged fraudulent
transactions occurred before execution of the management
agreement and Bancroft's decision to offer insurance utilizing
the ICC/IC model and the issue of the legality of Bancroft's
insurance programs from a tax perspective is not before the Court

---

18 In support of the foregoing allegations, the affidavits of Bailey,
Robert Spadafore, Patton, Schwab and Roberts were attached to the ICMC
Defendants' reply to Bancroft's brief in opposition to the motion to amend
counterclaim and add new parties. (Docket Nos. 152-3, 152-5, 152-11, 152-16,
152-18). The Court's review of the often rambling affidavits does not alter
its conclusion that Bancroft's renewed motion to strike should be granted.

in this case.  Under the circumstances, the Clerk will be directed to strike Docket Nos. 127 and 176.

VI

**Bancroft's Renewed Motion for Sanctions**

Bancroft seeks counsel fees from counsel for the ICMC Defendants under 28 U.S.C. § 1927 which provides:

> **§ 1927.  Counsel's liability for excessive costs**
>
> Any attorney or other persons admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927.

In LaSalle Nat. Bank v. First Connecticut Holding Group, LLC, 287 F.3d 279 (3d Cir.2002), a law firm and two of its attorneys appealed sanctions imposed by a district court under 28 U.S.C. § 1927.  In discussing the statute, the Court of Appeals for the Third Circuit stated:

*   *   *

> ...  The statute ... limits attorney sanctions imposed thereunder to situations where an attorney has: (1) multiplied proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional misconduct.  See In re Prudential Ins., 278 F.3d at 188.  The sanctions that may be imposed under § 1927 are also limited to excess costs and expenses that are incurred "because of such conduct."  28 U.S.C. § 1927.

The sanctions are intended to deter an attorney from *intentionally* and unnecessarily delaying judicial proceedings, and they are limited to the costs that result from such delay. See Zuk, 103 F.3d at 297. Although § 1927 provides a court with a mechanism for sanctioning vexatious and willful conduct, "courts should exercise [this sanctioning power] only in instances of a serious and studied disregard for the orderly process of justice." Ford v. Temple Hosp., 790 F.2d 342, 347 (3d Cir.1986), quoting Overnite Transp. Co. v. Chicago Industr. Tire Co., 697 F.2d 789, 795 (7th Cir.1983).

The power to sanction under § 1927 necessarily "carries with it the potential for abuse, and therefore the statute should be construed narrowly and with great caution so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law." Mone v. Commn'r of Intern. Revenue, 774 F.2d 570, 574 (2d Cir.1985); see also Ford, 790 F.2d at 349 ("The uncritical imposition of attorneys' fees can have an undesirable chilling effect on an attorney's legitimate ethical obligation to represent his client zealously."); Baker Industr. Inc. v. Cerberus, Ltd., 764 F.2d 204, 208 (3d Cir.1985)("Th[e] bad faith requirement is ... necessary to avoid chilling an attorney's legitimate obligation to represent his client zealously[.]").

Consequently, sanctions may not be imposed under § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal. See Zuk, 103 F.3d at 297;...

287 F.3d at 288-89.

After consideration of Bancroft's arguments in support of its motion for sanctions against counsel for the ICMC Defendants under 28 U.S.C. § 1927, the Court declines to grant the motion. Simply put, the Court cannot conclude that counsel filed the motion to amend the counterclaim against Bancroft, add new parties and join this case with other litigation involving Bancroft in bad faith. Rather, it appears to the Court that the

30

motion was filed as a result of counsel's misunderstanding of indemnification and the circumstances in which joinder of litigation is appropriate.

_William L. Standish_
William L. Standish
United States District Judge

Date: April 5, 2012