IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVNIA

| | |
|---|---|
| BANCROFT LIFE & CASUALTY ICC, LTD., | ) ) |
| Plaintiff, | ) ) ) |
| vs. | ) Civil Action No. 10-704 |
| INTERCONTINENTAL MANAGEMENT LTD. d/b/a INTERNCONTINENTAL CAPTIVE MANAGEMENT COMPANY, LTD., INTERCONTINENTAL MANAGEMENT, LTD., THE ROBERTS AND PATTON LAW FIRM, JOHN R. PATTON, ESQ., GEORGE THOMAS ROBERTS, ESQ., NIGEL BAILEY, CUNNINGHAM HUGHAN & COMPANY, THOMAS HUGHAN, C.P.A., DERNAR & ASSOCIATES, LLC, and DAVID K. DERNAR, C.P.A., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM**

**INTRODUCTION**

In Count VI of its Second Amended Complaint, Plaintiff, Bancroft Life & Casualty ICC, Ltd. ("Bancroft"), asserts a claim against Defendants Dernar & Associates, LLC ("D&A") and David K. Dernar, C.P.A. ("Dernar")(collectively, "Dernar Defendants"), for professional negligence under Pennsylvania law. Before the Court is the Dernar Defendants' motion to dismiss the claim pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, the motion to dismiss will be denied.

**FACTUAL ALLEGATIONS**

The allegations of Bancroft's second amended complaint that are relevant for purposes of the present motion to dismiss may be summarized as follows:

Bancroft is an international insurance company headquartered and licensed to do business in St. Lucia. On October 15, 2004, Bancroft entered into a management agreement with Defendant Intercontinental Management, Ltd., doing business as Intercontinental Captive Management Company, Ltd. ("ICMC"). Two of ICMC's principals, John R. Patton, Esquire ("Patton") and George Thomas Roberts, Esquire ("Roberts"), who held themselves out as experts in insurance regulation and taxation, were retained to serve as Bancroft's outside general counsel. Thereafter, the principals of Bancroft entrusted ICMC with its day-to-day operations and entrusted Patton and Roberts with all of Bancroft's regulatory compliance and tax issues. (Docket No. 262, § 1, p. 2).

In 2008, Bancroft began to offer an insurance program that is a potentially tax advantaged alternative for a company insuring its own risks. Under this program, Bancroft's clients/ insureds establish their own insurance companies that are devoted to handling the clients'/insureds' particular risks. These insurance companies, known as single parent incorporated cell captives ("ICs"), operate under Bancroft's insurance

2

license in St. Lucia. The premiums paid into an IC by the client/insured are tax deductible and may be invested by the IC in securities, provided strict corporate and regulatory requirements are met. Ultimately, Bancroft is responsible for ensuring the corporate and regulatory compliance of its ICs, which includes the filing of semi-annual reports providing a detailed financial picture of each IC. ICMC purported to form 10 ICs on Bancroft's behalf. (Docket No. 262, § 1, pp. 2, 4, § 24, § 32).

Rather than serve Bancroft's best interests while managing its day-to-day operations, ICMC, Patton, Roberts and ICMC's other principal, Defendant Nigel Bailey, worked against Bancroft, elevating their own interests above the interests of Bancroft. ICMC billed Bancroft for hundreds of thousands of dollars for services that either were not performed or performed so poorly that it was as if the services had not been performed at all. In addition, the accounting services provided to Bancroft by ICMC and its subcontractors were "atrocious, completely unreliable, and caused Bancroft to suffer increased regulatory scrutiny from the St. Lucia Ministry of Finance and the United States Internal Revenue Service." (Docket No. 262, § 1, pp. 2-3).

ICMC also failed to fulfill its responsibilities of managing, controlling and accounting for Bancroft's ICs. Among

3

other things, ICMC and its principals diverted fee income due to Bancroft from the ICs and attempted to steal the business of several of Bancroft's clients/insureds that had opted to insure their particular risks through the IC model. (Docket No. 262, § 1, p. 4).

In October 2009, following its discovery of how poorly ICMC and its principals were performing their management services, Bancroft terminated the management agreement with ICMC. Bancroft replaced ICMC with CBIZ, an accounting firm, which currently serves as Bancroft's third-party administrator. (Docket No. 262, § 1, p. 4).

D&A is a limited liability company organized under the laws of Pennsylvania with its principal place of business in Murrysville, Pennsylvania. Dernar is a certified public accountant and an owner/employee of D&A. The Dernar Defendants were hired by ICMC to provide accounting services for the Bancroft account. In particular, ICMC retained the Dernar Defendants to prepare: (1) Bancroft's quarterly and annual balance sheets and the related statement of income and retained earnings for 2008; (2) Bancroft's quarterly statements for 2009; (3) quarterly and annual balance sheets and the related statements of income and retained earnings for 2008 for the following Bancroft ICs: A&B Insurance Co. IC, CDG IC, Joyce IC, West IC and Nottingham IC; (4) quarterly statements for 2009 for

4

A&B Insurance Co. IC, CDG IC, Joyce IC, West IC and Nottingham IC; and (5) semi-annual returns as of June 30, 2009 for A&B Insurance Co. IC, CDG IC, Joyce IC, West IC and Nottingham IC. (Docket No. 262, §§ 11-12, §§ 62-63, §§ 198-99).

Bancroft is required by law to file an audited financial statement with the St. Lucia Ministry of Finance on an annual basis. BDO Seidman and its affiliates ("BDO Seidman") performed the annual audits of Bancroft's financial statements. The Dernar Defendants, among others, repeatedly failed to provide BDO Seidman with timely and accurate financial statements for auditing purposes. (Docket No. 262, § 68).

With respect to Bancroft's balance sheet for 2008 that had been prepared by the Dernar Defendants, there were numerous material errors in the accounting records supplied by ICMC to BDO Seidman for the 2008 audit. In fact, the 2008 balance sheet submitted to BDO Seidman had to be revised at least 5 times over a period of more than 4 months during which BDO Seidman was in constant communication with ICMC and the Dernar Defendants. ICMC and the Dernar Defendants also did not fully cooperate with CBIZ, Bancroft's new third-party administrator, and were exceptionally slow in turning over requested information, data and records relating to Bancroft. As of late September 2009, CBIZ had not received accurate information from ICMC and the Dernar Defendants to enable BDO Seidman to complete the audit of

Bancroft's 2008 financial statement. (Docket No. 262, § 75, §§ 99-100).

Because of the time required to correct the errors in Bancroft's 2008 balance sheet, Bancroft's audited financial statement for 2008 was not submitted to the St. Lucia Ministry of Finance in 2009. The Finance Minister noted not only the absence of Bancroft's audited financial statement for 2008, despite several extensions, but also the failure of ICMC and the Dernar Defendants to prepare and file semi-annual returns for Bancroft and its ICs for the periods ending June 30, 2009 and December 31, 2009, and Bancroft was threatened with regulatory action. (Docket No. 262, § 77, § 81, § 94).

Because of material errors and misstatements by the Dernar Defendants, among others, Bancroft's accounting records were unreliable and of no value. As a result, Bancroft was compelled to pay CBIZ approximately $240,000 to re-do its 2008 balance sheet and complete the audit of its 2008 financial statement to get an accurate picture of its financial condition. (Docket No. 262, § 104).

In the performance of their accounting services, the Dernar Defendants owed Bancroft a duty to use the skill, prudence and diligence commonly possessed and exercised by members of the accounting profession. The Dernar Defendants breached their duty to Bancroft by (1) repeatedly failing to provide BDO

6

Seidman with timely and accurate balance sheets, statements and reports; (2) by preparing quarterly and annual balance sheets and the related statement of income and retained earnings for Bancroft for 2008 that contained numerous material errors; (3) by failing to prepare a timely and accurate semi-annual report for Bancroft as of June 30, 2009; (4) by failing to prepare timely and accurate semi-annual reports for Bancroft's ICs as of June 30, 2009 and December 31, 2009; (5) by failing to cooperate with BDO Seidman in its efforts to complete and submit Bancroft's audited financial statement for 2008 to the St. Lucia Ministry of Finance; (6) by failing to comply with requests to turn over Bancroft's financial information, data and records to its new third-party administrator, CBIZ; and (7) by failing to comply with Bancroft's requests for the financial information, data and records relating to its ICs. (Docket No. 262, §§ 200-201).

The Dernar Defendants also breached their duty to Bancroft in the following respects: (1) by failing to alert Bancroft to the material errors in its 2008 balance sheet and the related statement of income and retained earnings that BDO Seidman had brought to their attention over the course of 4 months in 2009; (2) by failing to inform Bancroft that the 2008 financial information they had received from ICMC was incorrect, incomplete and otherwise unsatisfactory, which they learned from

7

BDO Seidman; and (3) by failing to obtain or demand reliable information or withdraw from their engagement to perform accounting work for Bancroft when they learned from BDO Seidman that the 2008 information provided by ICMC was incorrect, incomplete and otherwise unsatisfactory. (Docket No. 262, §§ 202-205).

Upon information and belief, ICMC failed to disclose critical information to Dernar in 2008 and 2009 concerning the level of Bancroft's reserves - "an absolutely essential value necessary for an accurate accounting of the assets side of the Bancroft balance sheet." The absence of this information should have put Dernar on notice of the fact that he was receiving incomplete information at best or inaccurate information at worst, thereby triggering an obligation to undertake greater due diligence rather than merely accepting the data supplied by ICMC at face value. (Docket No. 262, § 206).

The Dernar Defendants' breaches of their duty to Bancroft have caused Bancroft to suffer actual damages in excess of $75,000 to be more fully determined at trial, including (1) causing Bancroft and its ICs to be out of compliance with the laws and regulations of St. Lucia; (2) causing Bancroft to incur the cost and expense of having the inaccurate accounting work re-done and the accounting work that had not been performed completed; (3) causing Bancroft to suffer damages as a result of

8

the delay in discovering ICMC's failure to maintain and provide
accurate financial information for Bancroft and its ICs; and (4)
causing Bancroft to lose credibility with its auditor, the St.
Lucia insurance regulator, its ICs and its other insurance
clients. (Docket No. 262, § 207).

## LEGAL STANDARDS

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure,
a pleading that states a claim for relief must contain "a short
and plain statement of the claim showing that the pleader is
entitled to relief." The purpose of Rule 8(a)(2) is to give the
defendant fair notice of what the claim is and the grounds upon
which it rests.

In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the
United States Supreme Court abrogated the oft-repeated standard
enunciated in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), for
dismissal of a complaint for failure to state a claim upon which
relief can be granted under Fed.R.Civ.P. 12(b)(6), i.e., that a
complaint cannot be dismissed "unless it appears beyond doubt
that the plaintiff can prove no set of facts in support of his
claim which would entitle him to relief." Following Twombly, a
plaintiff must "nudge[] [his or her] claims across the line from
conceivable to plausible" in order to survive a motion to
dismiss. 550 U.S. at 570. See also Phillips v. County of
Allegheny, 515 F.3d 224, 233 (3d Cir.2008)("After Twombly, it is

9

no longer sufficient to allege mere elements of a cause of action; instead 'a complaint must allege facts suggestive of [the proscribed] conduct.'").

"Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Regarding this task, in Fowler v. UPMC Shadyside, 578 F.3d 203 (3d Cir. 2009), the Court of Appeals for the Third Circuit noted that

> "..., after Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Id. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." Id. at 1950. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. See Phillips, 515 F.3d at 234-35. As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Iqbal, 129 S.Ct. at 1949...."

\* \* \*

578 F.3d at 210-11.

In sum, "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime from a prior era, but it

does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 129 S.Ct. at 1950.

## APPLICABLE LAW

Professionals have a duty to perform their services with the "skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities." Restatement (Second) of Torts § 299A. To establish a claim of professional negligence under Pennsylvania law, which the parties agree applies in this case, the plaintiff must establish that (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was actually harmed; and (4) the defendant's breach caused that harm. In re: Citx Corp., Inc., 448 F.3d 672, 677 (3d Cir.2006), *citing* Martin v. Evans, 551 Pa. 496, 711 A.2d 458 (1998).

The specific scope of an accountant's duty to a client is determined primarily by the terms and conditions of the contract of employment. Robert Wooler Co. v. Fidelity Bank, 330 Pa.Super. 523, 531, 479 A.2d 1027, 1031 (1984), *citing* O'Neill v. Atlas Auto. Finance Corp., 139 Pa.Super. 346, 11 A.2d 782 (1940).

The three different types of services provided by accountants, *i.e.*, compilations, reviews and audits, provide varying levels of assurance. A compilation is the lowest level of assurance regarding an entity's financial statements. It

11

expresses neither an opinion nor any level of assurance by the
accountant. A review involves an intermediate level of scrutiny
in which the accountant provides limited assurance on the
entity's financial statements. In order to provide this limited
assurance, the accountant must make some, but not a
comprehensive, inquiry into client management, accounting
practices, internal control structure and analytical procedures
used by the client. Finally, an audit provides the highest
level of assurance on financial statements. The accountant
provides verification of a financial statement's claims and
assertions and expresses an opinion on the client's financials.
Among other things, during an audit, the accountant considers
and evaluates the client's internal control systems and tests
the underlying documentation to support account balances. Otto
v. Pennsylvania State Education Ass'n – NEA, 330 F.3d 125, 133
(3d Cir.2003).

Despite the level of assurance applicable to the service
for which an accountant is engaged, the accountant can breach
his or her professional duties to the client if he or she
encounters suspicious circumstances, i.e., "red flags," and
fails to disclose them to the client. Wooler, at 1032; In re
Citx Corp., Inc., Nos. 03-727, 03-CV-6766, 2005 WL 1388963, at
*6 (E.D.Pa., 6/7/2005); In re Computer Personalities Systems,

Inc., No. 01-14231DWS, ADV. 03-0220, 2003 WL 22844863, at *5
(Bkrtcy.E.D.Pa, 11/18/2003).

**DISCUSSION**

I

The Dernar Defendants initially seek dismissal of
Bancroft's professional negligence claim against them for lack
of standing. Relying on the district courts' decisions in
Williams Controls, Inc. v. Parente, Randolph, Orlando, Carey &
Assocs., 39 F.Supp.2d 517 (M.D.Pa.1999), and Steinbrink v.
Rothstein, Kass & Co., P.C., No. 01-382 Erie, 2008 U.S.Dist.
LEXIS 21527 (W.D.Pa., 3/19/2008), the Dernar Defendants argue
Pennsylvania law requires strict privity of contract between a
plaintiff and a defendant for the plaintiff to maintain a claim
of professional negligence against the defendant; the
allegations of Bancroft's second amended complaint show that
their agreements to perform the accounting services at issue
were made with ICMC, rather than Bancroft; and, therefore,
strict privity of contract is lacking and Bancroft does not have
standing to maintain a professional negligence claim against
them. (Docket No. 270, pp. 31-32). The Court does not agree.

In Guy v. Liederbach, 501 Pa. 47, 459 A.2d 744 (1983), a
question of first impression was presented to the Pennsylvania
Supreme Court; that is, whether a named beneficiary of a will
who is also named executrix has a cause of action against the

attorney who drafted the will and directed her to witness it
where the fact that she witnessed the will voided her entire
legacy and her appointment as executrix.  The trial court
dismissed the case based on Lawall v. Groman, 180 Pa. 532, 37 A.
98 (1897), and two Federal cases which found Pennsylvania to be
a "strict privity" state requiring an attorney-client
relationship to exist before there could be a malpractice
action.  On appeal, by divided vote, the Superior Court of
Pennsylvania reversed the trial court's decision, holding that
the plaintiff could proceed under either a negligence or a
contract theory.  In holding that the plaintiff could proceed
under a negligence theory, the Superior Court sought to adopt
the California rule for professional negligence claims
enunciated in Lucas v. Hamm, 56 Cal.2d 583, 364 P.2d 685 (1961),
cert. denied, 368 U.S. 987 (1962), i.e., the lack of privity
between a plaintiff and a defendant does not preclude the
plaintiff from maintaining a professional negligence claim
against the defendant.  Because the Superior Court's holdings
entailed, among other things, a change in the law of
Pennsylvania in the area of professional negligence, the
Pennsylvania Supreme Court granted the attorney's request for
review.  In analyzing the plaintiff's professional negligence
claim against the attorney who drafted the will at issue, the
Pennsylvania Supreme Court stated:

\* \* \*

Under present Pennsylvania law, an individual who has
an attorney-client relationship may sue his attorney for
malpractice under either a trespass or assumpsit theory.
See 1 Standard Pennsylvania Practice 2d § 4:66 and cases
therein. In dicta, Lawall v. Groman, supra, relying on the
principle that one who undertakes to perform a service for
another, even without reward, is bound to exercise
reasonable care and can be held responsible for
misfeasance, though not for nonfeasance, stated that a
third party could bring suit against an attorney in a
negligence action if the attorney knew that the third party
"was relying on him in his professional capacity." 180 Pa.
at 540, 37 A. 98. Despite this language, Federal courts
interpreting Pennsylvania law have held that mere
negligence of an attorney toward someone other than a
client is not actionable. Sachs v. Levy, supra; Connelly
v. Wolf, Block, Schorr & Solis-Cohen, supra. Thus we have
in the past adhered to the rule followed by the
overwhelming majority of states requiring the privity of an
attorney-client relationship in order to maintain a cause
of action.... At the very least, Lawall would require a
specific undertaking on the attorney's part to perform a
specific service for a third party, coupled with the
reliance of the third party and the attorney's knowledge of
that reliance in order for the third party to bring suit.

\* \* \*

If the beneficiary has a cause of action it will be
either in trespass or assumpsit. Appellants have argued
persuasively that the rule of Lucas v. Hamm which allows
for suits in trespass has proved unworkable, and has led to
*ad hoc* determinations and inconsistent results as the
California courts have attempted to refine the broad Lucas
rule. (citations omitted). Particularly troublesome in any
negligence action is the standard to be applied. The
California courts have not adopted a simple negligence
standard, but beginning with Biakanja v. Irving, 49 Cal.2d
647, 320 P.2d 16 (1958), have applied a six part balancing
test on a case-by-case basis. (footnote omitted). Of
special relevance to cases such as the present one is what
the attorney "knew or should have known," a task made all
the more difficult by the fact that the testator, whose
intentions and estate the attorney is to have knowledge of,
will not be present to testify.

15

Superior Court stated that it believed the Lucas test represented the "better view." Guy v. Liederbach, 279 Pa.Super.Ct. at 548, 421 A.2d at 335. We do not agree.... We find that the policy concerns expressed in Ultramares Corp. v. Touche, supra,[1] and the history in California, following its abolition of the privity requirement in negligence suits arising out of agreements to furnish

---

[1] In Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931), the defendants, public accountants, were employed by Fred Stern & Company, Inc. ("Stern"), a business engaged in the importation and sale of rubber, to prepare and certify multiple copies of a balance sheet showing the condition of Stern's business as of December 31, 1923. To finance its operations, Stern required extensive credit and borrowed large sums of money from banks and other lenders. In March 1924, the plaintiff was approached by Stern with a request for loans of money to finance sales of rubber. As a condition of any loans, the plaintiff insisted that it receive a balance sheet certified by a public accountant, and, in response, the plaintiff was given one of the certified balance sheets that had been prepared and signed by the defendants. On the basis of that balance sheet, the plaintiff loaned money to Stern. Subsequently, Stern defaulted on the loans

The defendants in Ultramares knew that in the usual course of business, Stern provided the certified balance sheets to, among others, banks, creditors and stockholders as the basis of financial dealings. Nothing was said as to the persons to whom the certified balance sheets would be shown or the extent or number of the transactions in which they would be used. In particular, there was no mention of the plaintiff, a corporation which until then had never made advances to Stern. In dismissing the plaintiff's professional negligence claim, Justice Cardozo noted that the range of transactions in which a balance sheet certified by the defendants might play a part "was as indefinite and wide as the possibilities of the business that was mirrored in the summary," and that "[i]f liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to liability in an indeterminate amount for an indeterminate time to an indeterminate class." Simply put, the foregoing concerns expressed by Justice Cardoza in Ultramares are not implicated in the present case.

Significantly, in an earlier case also decided by Justice Cardozo, Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275 (1922), the seller of beans requested the defendant, a public weigher, to make return of the weight and furnish the buyer with a copy. The defendant complied, providing duplicate returns - one to the seller and the other to the buyer. The return specifically stated that it was made by order of the former for the use of the latter. The buyer paid the seller on the faith of the certificate which turned out to be erroneous. Based on these facts, Justice Cardoza held that the weigher was liable to the buyer for the moneys overpaid as a result of its negligence, noting that "the service rendered by the defendant was primarily for the information of a third person, in effect, if not in name, a party to the contract, and only incidentally for that of the formal promisee." This is precisely the case presented here. The financial documents at issue were prepared specifically for Bancroft at the request of its management company. In fact, the circumstances of this case are even more compelling. Unlike the buyer of the beans in Glanzer, Bancroft paid for the professional services provided by the Dernar Defendants.

16

professional services, persuade us we should not eliminate
the privity requirement in malpractice actions based on
negligence.  Thus we retain the requirement that plaintiff
must show an attorney-client relationship **or a specific
undertaking by the attorney furnishing professional
services**, as in Lawall, as a necessary prerequisite for
maintaining such suits in trespass on a theory of
negligence. (emphasis added).

\*   \*   \*

501 Pa. at 57-58, 459 A.2d at 749-50.[2]

In light of the above-emphasized language in Guy, the Court
is compelled to conclude that Bancroft has standing to maintain
a claim for professional negligence against the Dernar
Defendants.[3]  Among other things, the second amended complaint
alleges that the Dernar Defendants were "specifically hired by
ICMC to handle the Bancroft account" (Docket No. 262, ¶ 12);
that the Dernar Defendants were specifically hired to prepare
various financial documents for Bancroft and its ICs (Docket No.
262, ¶¶ 62-63); that ICMC retained the Dernar Defendants on
Bancroft's behalf to prepare the financial documents which were

---

[2] In Guy, the Pennsylvania Supreme Court noted that the plaintiff could not
maintain a negligence claim against the attorney who drafted the will based
on "a specific undertaking" by the attorney to furnish services for her as
discussed in Lawall because the plaintiff could not have an attorney
specifically undertake for her the writing of a testator's will which made
her the residuary beneficiary of that will.  However, as a person named a
beneficiary under a will who lost the intended legacy due to the failure of
the attorney to properly draft the instrument, the plaintiff could bring a
claim in assumpsit against the attorney as a third-party beneficiary of the
agreement between the testator and the attorney to draft the will.  501 Pa.
at 59, 459 A.2d at 751.  Unlike the situation presented in Guy, there was
nothing to prevent the Dernar Defendants from specifically undertaking to
perform the accounting services for Bancroft that are alleged to have been
deficient.
[3] Whether Bancroft can prove the professional negligence claim against the
Dernar Defendants remains to be seen.

required to be audited prior to submission to the St. Lucia

Ministry of Finance (Docket No. 262, ¶¶ 198-99); and that the

2008 balance sheet prepared by the Dernar Defendants to be

submitted to Bancroft's auditor had to be revised at least five

times over a period of four months during which the auditor was

in "constant communication, by telephone and email, with ...

D&A" (Docket No. 262, ¶ 75).

With regard to the Dernar Defendants' reliance on the

district court's decision in Williams Controls Inc., supra, to

support their standing argument, the Court finds such reliance

misplaced.  In Williams Controls Inc., the buyer of a corporate

division sued the seller's accountant for, among other things,

professional negligence based on the accountant's preparation of

financial statements in connection with the transaction.  At the

time of the closing, the buyer had not yet received any audited

material from the seller's accountant.  At some point

thereafter, the seller provided the buyer with a final closing

balance sheet that had been audited by its accountant.  Despite

the fact the accountant had notice that its work product would

be used to determine the final adjusted purchase price for the

corporate division, the district court granted the accountant's

motion for summary judgment on the professional negligence claim

based on the lack of privity between the buyer and the

accountant and the buyer's failure to show a specific

undertaking by the seller's accountant to perform services for the buyer. In so holding, the district court noted: "In this case, it cannot reasonably be maintained that [the seller's accountant] was representing both [the seller] and [the buyer]. In fact, the record demonstrates that [the buyer] retained its own accountant to review [the seller's accountant's] work." 39 F.Supp.2d at 524 fn. 7. Unlike the seller's accountant in Williams Controls Inc., the Dernar Defendants were specifically engaged to perform accounting services for Bancroft. Thus, Williams Controls Inc. is distinguishable and does not provide support for the dismissal of Bancroft's professional negligence claim for lack of standing under Pennsylvania law.

The Dernar Defendants' reliance on the district court's decision in Steinbrink, supra, to support their standing argument also is misplaced. In Steinbrink, the plaintiffs were investors in two funds that were managed by B. Hauptman & Associates, LLC ("BHA"). Defendant Rothstein, Kass & Company, P.C. ("RKC") was retained by BHA to conduct annual audits of the funds. Because of the lack of performance of the first fund in which they invested, the plaintiffs informed BHA that they wanted to withdraw from the fund. In response, BHA suggested that the plaintiffs transfer their investments in the first fund to a new fund, and annual audit reports of both funds by RKC were provided to the plaintiffs by BHA. Following receipt of

the annual audit reports, the plaintiffs transferred their
investments in the first fund to the second fund. Subsequently,
the plaintiffs lost their investments. The plaintiffs'
professional negligence claim against RKC was dismissed by the
district court under Pennsylvania law for lack of privity. As
noted by Bancroft, however, the circumstances presented in
Steinbrink are distinguishable from the present case. (Docket
No. 276, p. 21). The accounting firm in Steinbrink had been
retained to prepare, among other things, annual audit reports by
the funds' partners. The plaintiffs were merely investors in
the funds. Under the circumstances, there was no basis for a
finding that the accounting firm had engaged in a specific
undertaking to perform a specific service for the plaintiffs.[4]

II

Alternatively, the Dernar Defendants assert that Bancroft
has failed to state a claim for professional negligence against
them under the Twombly standard. After consideration, the Court
finds this argument unpersuasive.

Considering the allegations pertaining to the Dernar
Defendants in the second amended complaint in their entirety,
Bancroft has adequately stated a plausible claim for

---

[4] It should be emphasized that, contrary to the argument of the Dernar
Defendants, the district courts in both Williams Controls Inc. and Steinbrink
interpreted Pennsylvania law as allowing a professional negligence claim by a
plaintiff who established either strict privity of contract with the
professional or a specific undertaking by the professional to perform a
specific service for the plaintiff.

20

professional negligence.[5] Specifically, Bancroft alleges the
Dernar Defendants owed it a duty to perform the accounting
services for which they were engaged with the skill, prudence
and diligence commonly possessed by members of the accounting
profession (Docket No. 262, ¶ 200); the Dernar Defendants
breached that duty by, among other things, preparing inaccurate
balance sheets (Docket No. 262, ¶¶ 201-06); and Bancroft
sustained damages as a result of the deficient accounting
services performed by the Dernar Defendants because it was
required to pay another entity to correct the inaccuracies in
the balance sheets (Docket No. 262, ¶¶ 104, 207).

With regard to their alternative argument in support of the
dismissal of Bancroft's professional negligence claim, the
Dernar Defendants assert that the accounting services which they
were engaged by ICMC to perform for Bancroft were limited to
compilations, which, as noted above, provide a client with the
lowest level of assurance. Assuming the extent of the Dernar
Defendants' engagement by ICMC was limited to compilations,[6] the

---

[5] The Dernar Defendants support their Twombly argument by analyzing the
allegations of the second amended complaint on a sentence-by-sentence basis,
rather than considering the allegations as a whole. In so doing, the Court
finds the Dernar Defendants erred. See Tellabs, Inc. v. Makor Issues &
Rights Ltd., 551 U.S. 308, 322-23 (2007).

[6] In support of their motion to dismiss, the Dernar Defendants submitted,
among other things, (a) a letter addressed to Bancroft dated December 9,
2008, proposing to prepare a compilation of Bancroft's annual and quarter-end
balance sheets and the related statement of income and retained earnings for
the year 2008, which was signed by Stuart Schwab, a vice president of ICMC;
and (b) a letter addressed to ICMC dated April 6, 2010, proposing to prepare
a compilation of the semi-annual and year-end balance sheets and the related

Dernar Defendants nevertheless remained liable for reporting any "red flags" encountered in preparing financial documents for Bancroft. See Wooler, supra. In this connection, the second amended complaint alleges such "red flags." Specifically, it is alleged that the levels of Bancroft's reserves in 2008 and 2009 were essential for the preparation of accurate balance sheets by the Dernar Defendants,[7] and the failure of ICMC to provide Bancroft's reserve levels for 2008 and 2009 should have put the Dernar Defendants on notice that they were receiving incomplete information at best, triggering an obligation to notify Bancroft and inquire further into the information being provided by ICMC. (Docket No. 262, ¶ 206). It is further alleged that the Dernar Defendants failed to alert Bancroft to the material errors in its 2008 balance sheet which had been brought to their attention by Bancroft's auditors. (Docket No. 262, ¶¶ 202-03).

---

statements of income and retained earnings for Joyce IC and CDG IC for the year 2009, which is unsigned. Bancroft disputes the authenticity of these documents. (Docket No. 276, pp. 11-12). Thus, they may not be considered in connection with the Dernar Defendants' motion to dismiss. See May v. Belichick, 605 F.3d 223, 230 (3d Cir.2010), citing, Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993)(In deciding a motion to dismiss for failure to state a claim, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon these documents).

[7] Whether this allegation is true is not before the Court at this time.

Based on the foregoing, the motion of the Dernar Defendants to dismiss Count VI of Bancroft's second amended complaint is denied.

_William L. Standish_
Judge William L. Standish
United States District Judge

Date: June _12_, 2012